**SCALLOP PETROLEUM COMPANY, A DIVISION OF SCALLOP CORPORATION, Plaintiff,**

v.

**BANQUE TRAD–CREDIT LYONNAIS [FRANCE] S.A., BAII Banking Corporation, Banque Arabe Et International d'Investissement, Belcher Company of New York, Inc., Defendants.**

No. 86 Civ. 1967 (LLS).

United States District Court, S.D. New York.

May 2, 1988.

Rogers & Wells, New York City (Joseph Spain, of counsel), Rogers & Wells, Los Angeles, Cal. (Marcia B. Pine, of counsel), for defendants BAII Banking Corp., and Banque Arabe Et Intern. d'Investissement.

Belcher Oil Co., Hasbrouck Heights, N.J. (Frank Leavitt, of counsel), Haight, Gardner, Poor & Havens, New York City (Richard Ashworth, of counsel), for plaintiff.

Latham & Watkins, New York City (Job Taylor, III, of counsel), for defendant Banque Trad–Credit Lyonnais [France] S.A.

## OPINION AND ORDER

STANTON, District Judge.

In this interpleader action, contesting creditors claim priority in the same collateral. Two of them whose interests substantially coincide, defendants BAII Banking Corporation ("BAII New York") and Banque Arabe et Internationale d'Investissement ("BAII Paris") (collectively "BAII"), move for and are granted summary judgment pursuant to Fed.R.Civ.P. 56 dismissing the claim of their competing defendant Banque Trad–Credit Lyonnais [France] S.A. ("Banque Trad") to the collateral.

### FACTS

The following facts are stipulated. Will Petroleum, Inc. ("Will"), a Texas corporation, was in the business of oil trading until it filed under Chapter 11 of the Bankruptcy Code on January 29, 1986. Before then, both BAII New York, a New York corporation, and BAII Paris, a French corporation, provided Will with financing under various arrangements. Will had a security agreement (undated), a continuing letter of credit agreement (August 6, 1984), and a revolving credit note (September 24, 1985) with BAII New York, and a general security agreement (December 13, 1982) and an agreement for the issuance of irrevocable letters of credit (August 6, 1984) with BAII Paris. Both security agreements covered all of Will's inventory, documents, accounts, and their proceeds. UCC–1 financing statements were filed by BAII New York in Texas (August 16, 1984), New Jersey (August 19, 1984), and New York (October 2, 1984), and by BAII Paris in Texas (October 10, 1985), New Jersey (November 21, 1984), and New York (November 21, 1984).

In early January 1986, Will bought approximately 312,000 barrels of oil from Selm SPA (the "Cargo"). These were loaded on the M.V. Himalaya in Italy on January 5, 1986. Before shipment, Selm SPA

obtained a letter of credit for approximately $7,500,000 in its favor for Will's account. On January 16, 1986 Will asked Banque Trad to "buy out" this loan. Will's telex to Banque Trad stated that "purchase/payment confirmation" would issue from Will's two buyers of the Cargo, and Will provided Banque Trad with the bill of lading for the Cargo. Banque Trad and Will did not execute any security agreements, and Banque Trad did not file a UCC–1 financing statement.

From January 24 through 28, 1986, the Himalaya discharged the Cargo. Almost 110,000 barrels were delivered to storage tanks of Belcher Oil Company of New York ("Belcher") in Bayonne, New Jersey (the "Belcher Oil"), and 198,000 barrels (the "Scallop Oil") to Scallop Petroleum Company ("Scallop") in Linden, New Jersey. Banque Trad and Will surrendered the bill of lading to the Himalaya's cargo master on January 23, 1986.

On Will's instructions Belcher confirmed that none of the Belcher Oil would be released without Banque Trad's telexed orders, and on January 29, 1986 Belcher issued to Banque Trad a non-negotiable warehouse receipt covering the Belcher Oil.

Will filed its Chapter 11 petition on January 29, 1986, and on January 31 Will advised Scallop that the funds due Will in payment for the Scallop Oil (approximately $4,266,964.00) were the property of Will's bankruptcy estate and should not be paid until further notice.

On February 5, 1986 the owner of the Himalaya caused an arrest of approximately 40,000 barrels of the Belcher Oil. On March 4, 1986 Belcher purchased for $1,097,242.83 the barrels of oil not subject to the arrest (the "Belcher Fund"). On April 21, 1986 Banque Trad, BAII, the Himalaya's owner, and Manufacturers Hanover Trust Company (as escrow agent) entered into an escrow agreement: the arrested oil was sold for $540,072.50 and the proceeds thereof deposited into an escrow account (the "Escrow Fund").

An Agreed Order Authorizing Abandonment of Inventory and Modification of Automatic Stay Against Acts Against Property (the "Agreed Order") was entered in Will's Chapter 11 case on February 13, 1986. The Agreed Order includes both the Scallop Oil and the Belcher Oil.

Scallop interpled the amount of $4,036,090.84 (the "Scallop Fund")[1] into the Bankruptcy Court for the Southern District of Texas on March 6, 1986. The interpleader action and the interpleader fund were transferred to this court on May 7, 1986. On September 10, 1986 the interpleader action was consolidated with this action.

Will currently owes BAII Paris over $12,900,000, BAII New York over $25,000,000, and Banque Trad $7,500,000. The funds which all claim (the "collateral") total just over five million dollars: the $4,036,090.84 Scallop Fund, the $1,097,242.83 Belcher Fund, and the $540,072.50 Escrow Fund, less $275,000 paid to the Himalaya's owner.

## DISCUSSION

Each of BAII Paris, BAII New York, and Banque Trad asserts that it has a perfected security interest in the collateral. Each also asserts that its status entitles it to priority over the others. To determine which has priority, the nature of each creditor's interest must be examined.

I. Nature of Creditors' Interests

A. BAII New York

The Uniform Commercial Code (the "UCC") sets forth the "three basic prerequisites to the existence of a security interest: agreement, value, and collateral.... When all of these elements exist, the security agreement becomes enforceable between the parties and is said to 'attach.' Perfection of a security interest will in many cases depend on the additional step of filing a financing statement." (UCC § 9–203(1), Comment 1)

Generally, two documents are required to perfect a security interest: an agreement granting a security interest in

---

1. The original Scallop Fund was reduced by approximately $200,000 because of a potential contingent claim by Scallop's customer and Will's late delivery of the Scallop Oil.

the collateral and a financing statement signed by both parties and filed for the public record. Their respective purposes are to show the debtor's intent to grant a security interest and to provide notice. *In the Matter of Bollinger Corp.*, 614 F.2d 924, 926 (3d Cir.1980). "[Since] the financing statement alone meets the basic section 9–203 requirements of a writing, signed by the debtor, describing the collateral," *id.* at 928, all that is needed is another document demonstrating intent. *Bollinger* held that a promissory note and a financing statement satisfied section 9–203:

> When the parties have neglected to sign a separate security agreement, it would appear that the better and more practical view is to look at the transaction as a whole in order to determine if there is a writing, or writings, signed by the debtor describing the collateral which demonstrates an intent to create a security interest in the collateral. 614 F.2d at 926.

*See also In Re Numeric Corp.*, 485 F.2d 1328 (1st Cir.1973) (financing statement and Board resolution showing debtor's intent).

■ BAII New York asserts that since September 1984 it has had a valid, perfected security interest in Will's inventory, accounts, documents, and their proceeds by virtue of its security agreement, continuing letter of credit agreement, revolving credit note, and UCC–1 financing statements. All these documents were signed by Gary Ettelman. Although the security agreement is undated, BAII New York contends that it was signed by September 1984, and that by early 1985 BAII New York realized it was not dated. (Declaration of Nadeem Fayyaz of Dec. 9, 1986 and its Exhibit E) Banque Trad requests cross-examination of the two BAII New York officers who support that assertion.

Putting aside the security agreement, the revolving credit note executed by Will and BAII New York before Banque Trad financed Will's purchase from Selm SPA demonstrates Will's intent to grant a security interest in favor of BAII New York.[2] The revolving credit note provides:

> In addition to all of its other rights ..., [BAII New York] shall have a lien on and a security interest in any property of [Will] which may from time to time be deposited with or held for the credit or benefit of [Will].... [BAII New York] may, at its option, apply any property in which it shall have such a lien or security interest to the payment and/or reduction, in whole or in part, of the Liabilities, whether or not then due.

The filed financing statements and the revolving credit note taken together meet the requirements of section 9–203(1). Accordingly, BAII New York had a perfected[3] security interest in all of Will's assets, at least to the extent of "the Liabilities" owed it under the revolving credit note, which attached to the Cargo when Will purchased the oil from Selm SPA in early January 1986.[4]

### B. BAII Paris

■ BAII Paris asserts that the December 13, 1982 security agreement and the August 6, 1984 agreement for the issuance of irrevocable letters of credit (both signed by Will's President, Richard Willis), and the three UCC–1 financing statements satisfy the requirements of UCC section 9–203(1).

Article III, Section 5 of Will's by-laws,

---

2. The continuing letter of credit agreement only covers individual transactions and, therefore, does not demonstrate Will's intent to grant BAII New York a security interest in all Will's property.

3. BAII perfected its security interest by filing the UCC–1 financing statements. UCC § 9–302(1).

4. Banque Trad asserts that there is a fact issue: whether Will bought the specific shipment comprising the Cargo before the Cargo was loaded on the Himalaya and covered by the bill of lading. If not, Will had no rights in the Cargo before it was covered by the bill of lading and BAII could have no rights prior to the bill of lading. As BAII points out, however, even if Will had no rights in the Cargo until the bill of lading was issued, BAII's security interest attached at that time and BAII's priority was unaffected. See discussion in Part II below.

adopted on April 1, 1982, provides [5]:

> Specifically, any transaction to be entered into by the President on behalf of the corporation involving an excess of $10,000 shall require approval of the Board of Directors, prior to consummation.... He may agree upon and execute any deeds, mortgages, bonds, contracts or other obligations in the name of the corporation.

A resolution of Will's sole director on April 1, 1982 states:

> ... the President is hereby authorized ... to pledge, hypothecate or mortgage as security to any selected bank any of the notes, bond, stocks, bills receivable, warehouse receipts and/or other documents, accounts, securities and/or property (real, personal or mixed) of this Corporation, and to execute and deliver any and all endorsements or instruments of assignment or transfer which may be necessary or proper ...

Banque Trad says that the first sentence of the by-law prohibited Mr. Willis from making the security agreement without the Board's approval.[6] BAII Paris argues that (1) the second sentence authorized Mr. Willis to execute the security agreement; (2) the first sentence only pertained to individual requests to borrow, all of which were approved by Will's sole director, Gary Ettelman; and (3) the contemporaneous resolution by Will's sole director did not contain any restrictions on Mr. Willis's authority to execute a security agreement.

Despite the ambiguity in the by-law, the resolution is clear, and it authorizes the President to grant security interests to selected banks. Further, Gary Ettelman's signature on each of the UCC–1 financing statements (which covered "All of the personal property and fixtures of [Will] wherever located and whether now owned or in existence or hereafter acquired or created" etc.) ratified the security agreement. The security agreement and the various UCC–1 financing statements, therefore, establish that BAII Paris had a valid, perfected security interest in all of Will's assets by January 1986.

## C. Banque Trad

■ All defendants agree for the purpose of this motion that Banque Trad was a holder to whom the bill of lading was duly negotiated. Banque Trad asserts that Article Seven of the UCC, "Warehouse Receipts, Bills of Lading and Other Documents of Title," governs this dispute and that under UCC section 7–502(1)(a) and (b) [7] it acquired title to the Cargo as well as to the bill of lading.

BAII contends that Banque Trad took the bill of lading as security for its loan to Will, and thereby acquired a purchase money security interest as defined under UCC section 9–107 [8]. It says that Article Seven does not apply since Banque Trad surrendered the bill of lading and no longer is a holder. BAII urges that Article Nine of the UCC, "Secured Transactions; Sales of Accounts and Chattel Paper," determines the priority between BAII and Banque Trad as secured creditors.

---

**5.** Mr. Willis's employment contract, dated April 23, 1982, contains a similar provision: "The authority of Willis to enter into any transaction on behalf of the Corporation without the written consent of the Board of Directors is limited to transactions not involving a gross dollar amount in excess of TEN THOUSAND ($10,000.00) DOLLARS."

**6.** Banque Trad also contends that the confines of Mr. Willis's authority is a factual dispute which precludes summary judgment. The dispute, however, is over the legal effect to be given to the documents.

**7.** "Subject to the following section and to the provisions of Section 7–205 on fungible goods, a holder to whom a negotiable document of title

has been duly negotiated acquires thereby: (a) title to the document; (b) title to the goods ..."

**8.** "A security interest is a 'purchase money security interest' to the extent that it is (a) taken or retained by the seller of the collateral to secure all or part of its price; or (b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used." Comment 1 to section 9–107 also provides: "Under this section ... a financing agency has a purchase money security interest when it advances money to the seller, taking back an assignment of chattel paper ..."

The scope of Article Nine was intended to be very broad. *Jackson County Federal Savings and Loan Association v. Maduff Mortgage Corporation,* 608 F.Supp. 588, 593 (D.Col.1985); *see also,* UCC § 9–102, Official Comment. Section 9–102 states that Article Nine "applies to any transaction (regardless of its form) which is intended to create a security interest in ... goods, documents, instruments, general intangibles, chattel paper or accounts ..." Section 9–104 specifies which transactions are excluded from Article Nine's provisions; they do not include security interests in negotiable documents. Further, "[r]ights, obligations and remedies under the Article do not depend on the location of title ..." (UCC § 9–101, Comment) Therefore, absent a compelling argument to the contrary, Banque Trad's loan to Will in consideration for the bill of lading is governed by Article Nine.

Although few cases have considered the interrelationship of Articles Seven and Nine, the present dispute is similar to *Douglas–Guardian Warehouse Corp. v. Esslair Endsley Co.,* 10 U.C.C. Rep. Serv. (Callaghan) 176 (W.D.Mich.1971). There the defendant, like BAII, had a previously perfected security interest while a bank, which perfected its interest through possession of a warehouse receipt, claimed that it was entitled to possession of the goods under section 7–503(1). The court held that the bank was a purchase money secured creditor and that section 9–312 "and sections cited therein alone governs priority controversies between holders of perfected security interests." *Id.* at 190. *See also John Deere Co. v. Neal,* 544 S.W. 2d 514, 516 (Tex.1976) (Article 9 applies to assignment of chattel paper because "part of a commercial financing transaction").

Here Banque Trad assumed the role of a purchase money secured creditor as defined in section 9–107(b): it loaned Will

$7,500,000 to enable Will to sell the Cargo to two oil companies. By extending the financing to Will, Banque Trad "enable[d] the debtor to acquire rights in or use of the collateral ..."

Thus, Article Nine governs this dispute.[9]

## II. Priority Among the Creditors

■ Banque Trad argues that it should prevail even if Article 9 governs this controversy. First, it asserts that under sections 9–312(1) ("the rules of priority stated in other sections of this Part ... shall govern when applicable.") and 9–309 [10], it had priority over BAII. BAII concedes that while Banque Trad held the bill of lading from January 17, 1986 until January 23, 1986, it had priority over BAII under section 9–309, but urges that when Banque Trad surrendered the bill of lading, it lost its status as a "holder to whom a negotiable document of title has been duly negotiated." Banque Trad maintains that despite such surrender its "superior interest ... continued, priority intact, in all proceeds under UCC § 9–306(1) and (2)." (Memorandum of Law of Banque Trad, p. 26)

> Section 9–306(1) and (2) provide:
>
> (1) "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds....
>
> (2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

This section does not concern the priority between holders of perfected security inter-

---

**9.** Thus, whether BAII (a) knew that Will regularly financed oil purchases by duly negotiating a document of title covering the oil to the financer, (b) knew that Will financed its purchase of the Cargo by allowing Banque Trad to hold the duly negotiated bill of lading, or (c) acquiesced within the meaning of UCC section 7–503, as Banque Trad suggests, is irrelevant.

**10.** "Nothing in this Article limits the rights of ... a holder to whom a negotiable document of title has been duly negotiated ... and such holders ... take priority over an earlier security interest even though perfected."

ests. *Bigelow–Sanford, Inc. v. Security–Peoples Trust Company*, 304 Pa.Super. 167, 450 A.2d 154 (Pa.1982). *Accord Deutz–Allis Credit Corp. v. Lynch Farms*, 387 N.W.2d 593, 595 (Iowa 1986) (section 9–306(2) does not establish priority rights between security interests; its only concern is with perfection). Rather, it pertains to a secured creditor's interest in the proceeds received by the debtor upon the debtor's disposition of collateral. (UCC § 9–206, Comment 1)

■ Here, after surrender of the bill of lading, part of the Cargo was released to Scallop and part to Belcher. The debtor, Will, did not receive any "proceeds" upon release of the oil. The UCC section which deals with the surrender of a negotiable document for the purpose of making the goods available to the debtor is section 9–304(5)(a):

(5) A security interest remains perfected for a period of 21 days without filing where a secured party having a perfected security interest in ... a negotiable document ...

(a) makes available to the debtor the goods or documents representing the goods for the purpose of ultimate sale or exchange or for the purpose of loading, unloading, storing, shipping, transshipping, manufacturing, processing or otherwise dealing with them in a manner preliminary to their sale or exchange, but priority between conflicting security interests in the goods is subject to subsection (3) of Section 9–312 ...

*See also* section 9–304, Comment 4 ("Under subsection (5) the 21 day perfection runs from the date a secured party who already has a perfected security interest turns over the collateral to the debtor (an example is a bank which has acquired a bill of lading by honoring drafts drawn under a letter of credit and subsequently turns over the bill of lading to its customer)"). Thus, even though Banque Trad surrendered the bill

of lading, its security interest remained perfected for 21 days.[11]

■ Priority between such conflicting security interests in the goods is determined by section 9–312(3):

A perfected purchase money security interest in inventory has priority over a conflicting security interest in the same inventory and also has priority in identifiable cash proceeds received on or before the delivery of the inventory to a buyer if

(a) the purchase money security interest is perfected at the time the debtor receives possession of the inventory; and

(b) the purchase money secured party gives notification in writing to the holder of the conflicting security interest if the holder had filed a financing statement covering the same types of inventory (i) before the date of the filing made by the purchase money secured party, or (ii) before the beginning of the 21 day period where the purchase money interest is temporarily perfected without filing or possession (subsection (5) of Section 9–304); ...

*See also* UCC § 9–304, Official Statement of Reasons for 1972 Changes in Official Text ("A provision has been added to subsection (5) making it clear that the 21–day period referred to therein deals only with perfection, but that there must be compliance with the notice provisions of Section 9–312(3) in order to achieve priority over earlier inventory financers.")

BAII contends that because Banque Trad did not give advance notice as required by section 9–312(3)(b), BAII has priority.

Banque Trad counters that it did not have to give notice. It argues that section 9–312(4)[12] applies since Banque Trad had a purchase money security interest in collateral, *i.e.*, the bill of lading, not in Will's inventory. It is not disputed that at the inception, Banque Trad had a security interest in the bill of lading. But following

---

**11.** Through possession of the non-negotiable warehouse receipt, Banque Trad's interest in the Cargo released to Belcher also continued to be perfected under section 9–304(3).

**12.** "A purchase money security interest in collateral other than inventory has priority over a

conflicting security interest in the same collateral or its proceeds if the purchase money security interest is perfected at the time the debtor receives possession of the collateral or within ten days thereafter."

surrender of the bill of lading for the purposes set forth in section 9–304(5), Banque Trad no longer had a security interest in the bill of lading; rather, it then had a security interest in the inventory, perfected under section 9–304(5). "Where the purchase money inventory financing began by possession of a negotiable document of title by the secured party, he must in order to retain priority give the notice required by subsection (3) at or before the usual time, i.e., when the debtor gets possession of the inventory, even though his security interest remains perfected for 21 days under Section 9–304(5)." (Section 9–312, Comment 3, para. 6).

Banque Trad also argues that section 9–312(3) can not apply here because Will never had possession of the Cargo, a requirement of section 9–312(3)(a). However, subsection 9–312(3)(a) only concerns the perfection of a secured party's interest; subsection 9–312(3)(b)(ii), on the other hand, recognizes that some creditors will benefit from section 9–304(5)'s automatic perfection provisions. Will's possession of the Cargo, therefore, has no bearing on the parties' relative priority rights; more to the point, it does not remedy Banque Trad's failure to comply with the notice requirement of subsection 9–312(3)(b).[13]

Section 9–312(3)'s priority scheme applies to security interests in inventory and identifiable cash proceeds. The Belcher Fund represents inventory. UCC § 9–109(4) (goods are inventory if held for sale); see also, Agreed Order, Exhibit A (listing Belcher Oil as inventory). The Escrow Fund constitutes identifiable cash proceeds. UCC § 9–306(1) ("Money, checks, deposit accounts, and the like are 'cash proceeds.' ") Since Banque Trad did not meet the notice requirement of section 9–312(3), the "catch-all" section 9–312(5)(a) applies. UCC § 9–312, Comment 4 ("[S]ubsection (5) applies to cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (3) and (4).") Section 9–

312(5)(a) states: "Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier ..." Since BAII filed its financing statement first, it has priority in the Belcher and Escrow Funds.

The Scallop Fund is an account. UCC § 9–106 (" 'Account' means any right to payment for goods sold ... which is not evidenced by an instrument or chattel paper ..."); see also, Agreed Order, Exhibit B (listing Scallop Oil as an account receivable). Section 9–312(5) also applies to the Scallop Fund. UCC § 9–312, Comment 3 ("[C]onflicting rights to proceeds consisting of accounts are governed by subsection (5).") Therefore, BAII has priority.

## CONCLUSION

The BAII defendants' motion for summary judgment is granted.

The parties are to submit, on consent as to form if possible, a proposed final judgment.

So ordered.

---

13. Will's filing of a bankruptcy petition on January 29, 1986, 6 days after Banque Trad surrendered the bill of lading, did not relieve Banque Trad of its duty to notify BAII. To achieve priority, subsection 9–312(3)(b)(ii) requires notification before the beginning of the 21–day automatic perfection period—i.e., before January 23, 1986. Therefore, Banque Trad's assertion that the filing date "fixed" the relative priority of the creditors is irrelevant.