# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3254

_____

Phillip Kunkel, Trustee of the      *
Bankruptcy Estate of John D.    *
Morken and Dorothy M. Morken, *
       *
       Plaintiff - Appellee, *
       *
       *
    v.       *
       *
Sprague National Bank,      *
       *
       Defendant - Appellant,        *
Appeal from the United States
       *    District Court for the
       *    District of Minnesota.
First National Bank of Hoxie, *
Kansas,        *
       *
       Defendant - Appellee,        *
       *
Hoxie Feeders, Inc.,       *
       *
       Defendant - Appellee,        *
       *
Charles W. Ries, Trustee of     *
the Bankruptcy Estate of     *
S p r i n g   Grove Livestock Exchange,        *
       *
Inc.,           *
       *
       Defendant,     *
       *

Firstar Bank Milwaukee, N.A., *
                                *
        Defendant, and     *
                                *
Firstar Bank Sioux City, N.A.,                        *
                                *
        Defendant.        *
                  _____

                        Submitted:  March 10, 1997

                Filed: October 20, 1997
                  _____

Before MURPHY, JOHN R.GIBSON, and MAGILL, Circuit Judges.
                  _____

JOHN R. GIBSON, Circuit Judge.

    In this appeal two creditors, Hoxie Feeders, Inc. and
Sprague National Bank, both claim first priority security
interests in the same cattle.  The district court
affirmed the bankruptcy court's summary judgment for
Hoxie holding that Hoxie's purchase money security
interest had priority over Sprague's earlier security
interest in the cattle.  Kunkel v. Sprague Nat'l Bank,
198 B.R. 734, 735 (D. Minn. 1996).  As an alternative
holding for Hoxie, the district court held that Sprague
did not have a security interest in the cattle because
the debtor lacked "rights in the collateral," as required
by the Uniform Commercial Code.  Id. at 739.  On appeal,
Sprague alleges that the district court erred in
interpreting and applying various provisions of the UCC
governing sales and secured transactions.  We reverse
the district court's holding that Sprague did not

have a security interest in the cattle but affirm its judgment for Hoxie because Hoxie's security interest is senior to Sprague's security interest.[1]

Beginning in 1990, Sprague made a number of loans to John and Dorothy Morken pursuant to certain loan agreements and promissory notes. The Morkens executed a security agreement in favor of Sprague covering their inventory, farm products, equipment, and accounts receivable presently owned or thereafter acquired. Sprague filed with the Kansas Secretary of State a UCC-1 financing statement regarding the collateral located in Kansas.[2] Sprague contends that the Morkens' debt to Sprague currently exceeds $1.9 million.

Hoxie is in the business of financing and selling cattle and operating a feedlot near Hoxie, Kansas. In five transactions between February and April 1994, John Morken purchased interests in approximately 1900 head of cattle from Hoxie. Hoxie financed Morken's cattle purchases. For each transaction, Morken executed a loan

---

[1]Both the Morkens' bankruptcy trustee and First National Bank of Hoxie, Kansas submitted briefs requesting that the bankruptcy court be given the opportunity to rule on certain issues in the event that we do not affirm the district court. Because we affirm, we need not address these requests.

[2]Although Morken may have had cattle operations in other states, only the cattle located in Kansas are at issue here. The parties agree that the Kansas UCC governs this dispute. All citations to the Kansas UCC are to the 1996 volume, Chapter 84, of the Kansas Statutes Annotated.

The parties also agree that the cattle are "inventory" under the UCC. See Kan. Stat. Ann. § 84-9-109(4) (defining "inventory").

agreement and promissory note in favor of Hoxie and a security agreement granting Hoxie a purchase money security interest[3] (PMSI) in the cattle, which were identified

---

[3]Article 9 of the UCC defines a "purchase money security interest" to include a security interest to the extent it is "taken or retained by the seller of the collateral

to secure all or part of its price." Kan. Stat. Ann. § 84-9-107.

by lot number when the documents were executed. In addition, Hoxie was paid $100 per head by either Morken or a company in which he owned an interest. The invoices for the cattle transactions recited that the cattle were shipped to Morken, Hoxie, or both.

Hoxie did not file a UCC-1 financing statement with the Kansas Secretary of State but instead perfected its security interest by taking possession of the cattle pursuant to feedlot agreements between Morken and Hoxie.[4] The feedlot agreements stated that the cattle belonged to "the Party of the First Part," meaning Morken, and acknowledged that Morken had delivered the cattle to Hoxie, although Morken never had physical possession of the cattle. Under the feedlot agreements, the cattle were to remain on Hoxie's feedlot for purposes of care and feeding. The feedlot and loan agreements authorized Hoxie to sell the cattle in its own name for slaughter, to receive direct payment from the packing house, and to deduct the feeding and purchase expenses from the sale proceeds and then remit the balance to Morken. Hoxie's general manager acknowledged, however, that he needed Morken's authority to sell the cattle, and that Morken determined at what price the cattle would be sold. The loan agreements recited that Morken bore all risk as to the profit or loss generated by feeding and selling the cattle.

On June 10, 1994, Morken and his wife filed a Chapter 11 bankruptcy case under Title 11 of the United States

---

[4]See Kan. Stat. Ann. § 84-9-305 (permitting perfection of a security interest in goods by possession).

Bankruptcy Code.  After the bankruptcy case was commenced, Hoxie sold the cattle to Iowa Beef Processors for slaughter.  After deducting amounts owed to Hoxie for the care and feeding of  the cattle, approximately

$550,000 in sale proceeds remained.[5]  It is these funds which are the subject of competing claims by Sprague and Hoxie.

After the cattle sales, the Morkens' bankruptcy trustee commenced an adversary proceeding in the bankruptcy court to determine which party -- Sprague or Hoxie -- was entitled to the net sale proceeds.  Hoxie and the trustee subsequently reached a settlement.  Hoxie and Sprague filed cross-motions for summary judgment regarding entitlement to the funds.

The bankruptcy court granted Hoxie's motion for summary judgment and denied Sprague's motion.  It held that both Sprague and Hoxie had perfected security interests in the cattle but Hoxie's interest had first priority under the Kansas UCC, Kan. Stat. Ann. § 84-9-312(3).  This UCC provision gives "superpriority" to a creditor with a PMSI in inventory if certain conditions are met, including the requirement that the creditor must send a specified notification to any competing secured party.  The competing secured party must receive the notification within five years before the debtor receives possession of the inventory.  Although Sprague did not send its statutory notification to Hoxie until March 1995, long after the cattle had been sold and slaughtered and the adversary proceeding commenced, the bankruptcy court held that the timing of the notification was

_____

[5]The parties do not dispute that Hoxie was entitled to deduct its care and feeding costs from the sale proceeds.  It is the balance remaining -- which Sprague contends is "just short of $577,000" and Hoxie contends is "about $550,000" -- to which the parties lay competing claims.

nevertheless sufficient because "the Debtor never obtained possession and never will."

Sprague appealed to the district court, which affirmed the bankruptcy court's summary judgment in favor of Hoxie. The district court held that a creditor that has perfected its security interest in inventory through possession, rather than by filing, is

not required to provide notification of its PMSI to competing secured creditors to attain "superpriority." According to the district court, the "superpriority" provision presumes that the creditor perfected by filing and that the debtor has possession of the inventory. The court concluded that this presumption was strong evidence that the notification requirement did not apply to a PMSI creditor that perfects by possession. 198 B.R. at 737-38.

As an alternative holding, the district court ruled that Sprague did not even have a security interest in the cattle because delivery of the cattle to Morken had not been completed and, therefore, no "present sale" had occurred. The court explained:

> Under Kansas law, a delivery may be completed although the goods remain in the possession of the seller if the seller's possession "is as an agent or at the request of the buyer under an agreement to store or care for the property, and nothing further remains to be done by either party to complete the sale." Lakeview Gardens, Inc. v. Kansas, 221 Kan. 211, 557 P.2d 1286, 1290-91 (1976) (emphasis added). Here, something further was required, payment to Hoxie under the loan agreement.

Id. at 739. Because the transactions were not a "present sale," the court reasoned that Morken did not have "rights in the collateral," as required by the Kansas UCC, Kan. Stat. Ann. § 84-9-203(1)(c), to convey a security interest in the cattle to Sprague. Morken's interest in the cattle was only a "remedial" interest against Hoxie; such an interest was inadequate to support

Morken's alleged grant of a security interest to Sprague. Id. at 739-40.

## I.

On appeal, the district court's grant of summary judgment is reviewed under a de novo standard. See Miller v. Citizens Sec. Group, Inc., 116 F.3d 343, 345 (8th Cir. 1997). Summary judgment is proper if there are no genuine issues of material fact and

Hoxie is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c). We view the evidence in the light most favorable to Sprague and give it the benefit of all reasonable inferences. See Miller, 116 F.3d at 345. If Sprague can present evidence that would permit a reasonable fact finder to find in its favor, summary judgment is inappropriate. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

We also apply a de novo standard of review to the questions of law raised by the parties, including the interpretation and application of the UCC. See Affeldt v. Westbrooke Condominium Ass'n (In re Affeldt), 60 F.3d 1292, 1294 (8th Cir. 1995).

The issues on appeal are: (a) did Sprague have a perfected security interest in the cattle?; (b) did Hoxie have a "superpriority" purchase money security interest which had priority over Sprague's interest in the cattle?; and (c) was Hoxie entitled to the proceeds from the sale of the cattle to IBP?

## II.

The district court held that Sprague did not have a security interest in the cattle because Morken did not have "rights in the collateral" sufficient for a security interest to attach. We reverse on this issue.

Under the UCC, a security interest is not enforceable against the debtor or third parties, and does not attach, unless and until the following three requirements are met: (a) either the secured party has possession of the collateral by agreement with the debtor (as is the case

here) or the debtor has signed a security agreement; (b) value has been given; and (c) "the debtor has rights in the collateral." Kan. Stat. Ann. § 84-9-203(1). Only the last requirement is at issue in this case.

The phrase "rights in the collateral" is not defined in the UCC. "If the debtor owns the collateral outright, it is obvious that the security interest may attach . . . ." B.

Clark, <u>The Law of Secured Transactions Under the Uniform Commercial Code</u> ¶ 2.04[1], at 2-43 (Rev. ed. 1993). It is also well-settled, however, that "rights in the collateral" may be an interest less than outright ownership, but must be more than the mere right of possession. <u>See</u> <u>id.</u>; <u>see also</u> 4 J. White & R. Summers, <u>Uniform Commercial Code</u> 126 (4th ed. 1995) ("It follows that almost any 'rights in the collateral' will suffice under 9-203."). The concept of "title" is not determinative. <u>See</u> Kan. Stat. Ann. § 84-9-202. "An agreement to purchase can give rise to sufficient rights in the debtor to allow a security interest to attach, regardless of whether the debtor has technically obtained title to the property." <u>United States v. Ables</u>, 739 F. Supp. 1439, 1444 (D. Kan. 1990). Courts consider factors such as the extent of the debtor's control over the property and whether the debtor bears the risk of ownership. <u>See</u>, <u>e.g.</u>, <u>Kinetics Tech. Int'l Corp. v. Fourth Nat'l Bank</u>, 705 F.2d 396, 399 (10th Cir. 1983) (debtor's control); <u>Chambersburg Trust Co. v. Eichelberger</u>, 588 A.2d 549, 552-53 (Pa. Super. Ct. 1991) (debtor had risk of ownership). The debtor need not have possession in order to pledge the property; the UCC expressly contemplates that the secured party may retain possession of the collateral. <u>See</u> Kan. Stat. Ann. § 84-9-305.

The district court looked to Article 2 of the UCC, which governs sales, to determine whether Morken had "rights in the collateral." It was appropriate to consider Article 2 principles. "In many cases the secured creditor may turn to Article 2 of the UCC to measure the debtor's 'rights' with respect to collateral." Kan. Stat. Ann. § 84-9-203 Kan. cmt.

(1996).   The district court erred, however, in its interpretation of Article 2 and its conclusion that the cattle transactions did not bestow Morken with "rights in

the collateral."[6]  As will be seen, the cattle were sold and delivered by Hoxie to Morken and Morken thus acquired "rights in the collateral."

A "sale" is the passing of title from buyer to seller for a price.  Kan. Stat. Ann. § 84-2-106(1).  Where delivery of the goods is made without moving the goods, title passes from buyer to seller at the time parties contracted if the goods are identified at that time.  Id. § 84-2-401(3)(b).  When identification occurs, the buyer acquires a "special property" and, importantly, any title interest retained by the seller is limited to the reservation of a security interest.  Id. § 84-2-401(1).  Physical receipt of the goods by the debtor is not necessary; rather, a sale may take place if the goods are constructively delivered to the buyer through delivery to the buyer's agent or bailee.  "Delivery is not required for a 'sale' to take place, and the buyer does not even need any right to possession of the goods in question."  B. Clark, The Law of Secured Transactions ¶ 3.04[2], at 3-48.[7]

---

[6]The court also erred in concluding that Morken had "rights in the collateral" sufficient for Hoxie's security interest to attach but not Sprague's security interest. The "rights in the collateral" inquiry focuses on the debtor's relation to the collateral, and does not vary from one secured party to another.  Thus, Morken either had "rights in the collateral" and both security interests attached, or he had no rights and neither security interest attached.

[7]The district court quoted Lakeview Gardens, Inc. v. State ex rel. Schneider, 557 P.2d 1286 (Kan. 1976), for the proposition that a completed delivery can occur, even though the goods remain in the seller's possession, if "nothing further remains to be done by either party to complete the sale."  198 B.R. at 739 (quoting 557 P.2d at 1291).  Because Morken still had the duty to pay Hoxie, the court reasoned that neither delivery nor a completed sale had occurred.  The Lakeview Gardens case,

In this case, the cattle were identified in the invoices and other transaction documents, and the parties agreed that delivery would be made to Morken by delivering the cattle to Hoxie at its feedlot. The feedlot agreements recited that the cattle belonged to Morken. Morken solely bore the risk that the venture would not generate a profit. Hoxie became a bailee of the cattle because it took "delivery of property for some particular purpose on an express or implied contract that after the purpose has been fulfilled the property will be returned to the bailor, or dealt with as he directs." M. Bruenger & Co., Inc. v. Dodge City Truck Stop, Inc., 675 P.2d 864, 868 (Kan. 1984) (quoting 8 C.J.S. Bailments § 1). Even though Hoxie had the right to deduct the costs of purchasing and caring for the cattle from the sale

---

however, reaches the opposite conclusion. The case involved the plaintiff's "preneed" sale of caskets to individuals who would purchase by paying cash or making installment payments. 557 P.2d at 1290. The casket would then be identified by number and stored in the seller's warehouse until requested by the buyer. The Supreme Court of Kansas held that constructive delivery of the caskets had occurred, even though the buyers might still have owed for their casket under an installment contract, and even though the seller retained possession of the caskets on behalf of the buyers. Id. at 1291.

By analogy here, delivery of the cattle to Morken occurred, even though he was still obligated to pay Hoxie for the cattle, and even though Hoxie retained possession of the cattle on Morken's behalf. Thus, the sales were complete. The district court erred in holding that the sale arrangements were executory contracts just because Morken had not paid Hoxie. "An executory contract is one the obligation of which relates to the future." Wagstaff v. Peters, 453 P.2d 120, 124 (Kan. 1969). "However, a contract is not executory merely because it has not been fully performed by payment, if all the acts necessary to give rise to the obligation to pay have been performed." Id. Thus, the fact that Morken had not fulfilled his payment obligations did not make the agreements executory.

proceeds, the parties viewed Morken as owner of the cattle,[8] and Morken determined when cattle would be sold and at what price.  In sum, Morken became the owner of an interest in

[8]In addition to the evidence recited above, the record contains other evidence that the parties viewed Morken as owner.  Hoxie stated in its interrogatory responses that the cattle were owned and placed in the feedlot by Morken, and letters from Hoxie's counsel prior to this litigation also stated that Morken owned the cattle.

the cattle, and Hoxie's interest in the cattle was therefore limited to that of a bailee and secured party.[9]

In similar circumstances, other courts have held that the debtor acquired "rights in the collateral" even though the debtor received only constructive delivery of the cattle to a feedlot.  See, e.g., The Cooperative Fin. Ass'n, Inc. v. B & J Cattle Co., 937 P.2d 915, 917, 920-21 (Colo. Ct. App. 1997) (debtor acquired rights when cattle were delivered to a third party feedlot; secured creditor prevailed over unpaid cattle seller); O'Brien v. Chandler, 765 P.2d 1165, 1168-69 (N.M. 1988) (same); see also The Hong Kong & Shanghai Banking Corp. v. HFH USA Corp., 805 F. Supp. 133, 142-43 (W.D.N.Y. 1992) (physical possession of the collateral is not necessary for the debtor to have rights).

Hoxie contends that the sale transactions were not completed because it had the right to stop delivery of the cattle upon discovering Morken's insolvency.  See Kan. Stat. Ann. § 84-2-702.  Hoxie lost its Article 2 right to stop delivery, however, when the cattle were constructively delivered to Morken and Hoxie acknowledged to Morken in the feedlot agreements and other transaction

---

[9]Crocker National Bank v. Ideco Division of Dresser Industries, Inc., 839 F.2d 1104 (5th Cir. 1988), cited by the district court and relied upon by Hoxie, is factually distinguishable.  The buyer and seller had agreed that the drilling rigs at issue would be delivered to a common carrier, which never occurred.  Id. at 1107.  Therefore, delivery did not take place, the sale was not consummated, and the buyer never acquired "rights in the collateral."  Id. at 1107-09.

Here, in contrast, the parties had agreed that the cattle would be constructively delivered to the Hoxie feedlot, and this happened.  Thus, the sales were consummated, and Morken acquired "rights in the collateral."

documents that Morken had purchased the cattle and Hoxie was holding them for Morken for feeding and sale purposes.  See id. § 84-2-705(2)(b); see also Abilene Nat'l Bank v. Fina Supply, Inc. (In re Brio Petroleum, Inc.), 800 F.2d 469, 472 (5th Cir. 1986) ("the Code makes clear that a

seller's right to stop goods in transit may continue after delivery and until the buyer is in actual, physical or constructive possession of them"); Ramco Steel, Inc. v. Kesler (In re Murdock Mach. & Eng'r Co.), 620 F.2d 767, 773 (10th Cir. 1980) (same).

Moreover, in some circumstances, the debtor can transfer greater rights in the collateral to a third party than the debtor himself holds. Thus, "[a] person with voidable title has power to transfer a good title to a good faith purchaser for value." Kan. Stat. Ann. § 84-2-403(1). "Purchase" includes taking an interest in property by mortgage, pledge, or lien. Id. § 84-1-201(32). Therefore, a secured party such as Sprague can be a "good faith purchaser"[10] which can acquire an interest in the collateral greater than the interest of the debtor, Morken, and superior to the interest of an unpaid seller such as Hoxie. The leading case on this point is Stowers v. Mahon (In re Samuels & Co., Inc.), 526 F.2d 1238 (5th Cir.) (en banc) (per curiam), cert. denied, 429 U.S. 834 (1976), pitting a creditor with a security interest in the debtor's cattle against the unpaid seller of the cattle. The court held that the secured creditor's interest was superior to the unpaid seller's interest under UCC § 2-403 which "gives good faith purchasers of even fraudulent buyers-transferors

---

[10]To receive good title under Kan. Stat. Ann. § 84-2-403(1), Sprague would have to be a "purchaser," act in "good faith," and provide "value." Sprague was a purchaser because it took a security interest in the cattle and provided value through extending credit, but we do not reach the good faith issue because of our holding in Part III. Even assuming that Sprague was a "good faith purchaser for value," Hoxie nevertheless prevails because Hoxie has a "superpriority" purchase money security interest. See Kan. Stat. Ann. § 84-9-312(3).

-20-

greater rights than the defrauded seller can assert." Id. at 1242. As to whether the debtor had "rights in the collateral," the court reasoned that the UCC's priority scheme of elevating a "good faith purchaser" over an unpaid seller necessarily requires that the debtor had "rights in the collateral" even though it had not paid for the cattle:

> The existence of an Article Nine interest presupposes the debtor's having rights in the collateral sufficient to permit attachment, § 9-204(a). Therefore, since a defaulting cash buyer has the power to transfer a security interest to a lien creditor, including an Article Nine secured party, the buyer's rights in the property, however marginal, must be sufficient to allow attachment of a lien.

Id. at 1243.[11] Thus, the debtor had "rights in the collateral," even though it had not paid the seller for those cattle.[12]

In summary, when the dust had settled after each of the five cattle transactions: (a) a sale had occurred; (b) Hoxie had constructively delivered the cattle to Morken and had possession of the cattle on Morken's behalf; (c) Morken had title to and owned the cattle; (d) the only interest retained by Hoxie in the cattle was a security interest and interest as bailee; (e) Hoxie's UCC Article 2 remedy of refusing to deliver the cattle had been cut off; and (f) Morken had "rights in the collateral" sufficient for Sprague's security interest to attach. Accordingly, we hold that Sprague had a

---

[11]Although the debtor in In re Samuels & Co. had taken actual possession of the cattle, and the debtor here took constructive possession of the cattle, this distinction does not alter the rule that the secured party's interest in the collateral is superior to the unpaid seller. As explained above, the debtor can acquire "rights in the collateral" through both actual and constructive possession.

[12]Kansas courts have cited In re Samuels & Co. with approval. See, e.g., Iola State Bank v. Bolan, 679 P.2d 720, 726-27 (Kan. 1984); see also Holiday Rambler Corp.v. Morris, 32 UCC Rep. Serv. 1222, 1225-26 (D. Kan. 1981) (debtor had rights in goods even though it failed to pay seller).

perfected security interest in the cattle and reverse the district court on this issue.

**III.**

Having determined that Sprague held a perfected security interest in the cattle, we now turn to the priority dispute between the two secured creditors, Sprague and Hoxie. We hold that Hoxie attained purchase money security interest "superpriority" under the Kansas UCC, Kan. Stat. Ann. § 84-9-312(3), and has priority over Sprague's interest.

Section 9-312 of the UCC sets forth rules for determining priorities among conflicting security interests in the same collateral. See Kan. Stat. Ann. § 84-9-312. The general priority scheme is that the first creditor to perfect its security interest beats later perfected security interests. See Kan. Stat. Ann. § 84-9-312(5)(a). There is an important exception to this "first-to-perfect" rule for a purchase money security interest. A PMSI in inventory has "superpriority" over an earlier perfected interest if: (a) the PMSI is perfected at the time the debtor receives possession of the inventory; (b) the PMSI creditor gives written notification to all holders of competing security interests which had UCC-1 financing statements on file when the PMSI creditor filed its UCC-1; (c) the competing secured creditor receives the notification within five years before the debtor receives possession of the inventory; and (d) the notification states "that the person giving the notice has or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type." Id. § 84-9-312(3).

Sprague contends that the Section 84-9-312(3)'s "superpriority" status cannot be attained by a creditor that has perfected its security interest in inventory by possession, rather than by filing a UCC-1 financing statement. It emphasizes language in this UCC section and its commentary that refers to perfection by filing and the debtor receiving possession of the inventory. See Kan. Stat. Ann. § 84-9-312(3) & Official UCC cmt. 3. We observe, however, that there is no language expressly excluding a creditor that has perfected by possession from taking advantage of this UCC section. More importantly, there is no sound policy reason to distinguish between perfection by filing and possession, and to provide the former, but not the latter, the opportunity to attain "superpriority." The common law of pledge -- perfection by possession -- predates, and was incorporated by, the UCC. In addition, pre-UCC law afforded special priority to purchase money security interests, and this has been carried over into the UCC.

See B. Clark, The Law of Secured Transactions ¶ 3.09[1], at 3-100 ("the purchase money priority . . . breaks up what would otherwise be a complete monopoly on the debtor's collateral"). Thus, the UCC, as it stands today, does not reflect any intent to penalize a PMSI creditor by depriving it of the opportunity to attain "superpriority" simply because of its means of perfection.

We believe that there is a more logical explanation for UCC § 9-312(3)'s contemplation that a creditor with a security interest in inventory would likely perfect by filing rather than possession. Inventory are goods "held for immediate or ultimate sale." Kan. Stat. Ann. § 84-9-

109 Official UCC cmt. 3. The debtor typically needs its inventory to run its business and is not in a position to allow a third party, such as its lender, to possess the inventory. Therefore, the situation here -- in which the creditor has possession of the inventory -- will arise only rarely. The fact that the "superpriority" provision of Section 84-9-312(3) does not expressly refer to perfection by possession does not establish that its scope is limited to perfection by filing. The UCC was not drafted to address every possible factual situation, but, rather, was "intentionally designed to allow room to grow," Kan. Stat. Ann. § 84-1-102 Kan. cmt. 1 (1996), and to accommodate the "expansion of commercial practices." Id. Official UCC cmt. 1.

Having concluded that it was possible for Hoxie to use Section 84-9-312(3) to attain "superpriority," we must now decide whether it did so by fulfilling the statutory requirements. The only requirement at issue here is the timing of Hoxie's PMSI notice, which was received after the cattle were sold and slaughtered and this litigation was commenced. We believe that this issue turns on the meaning of "possession" in the

context of Section 84-9-312(3). As explained above, the UCC treats constructive possession as analogous to actual possession in certain circumstances. If Morken's constructive possession triggered the notification requirement, then Hoxie's notification was untimely because Sprague received the notification after Morken received constructive possession of the cattle. On the other hand, if "possession" is limited to actual possession, Hoxie's notice was timely because Sprague received it before Morken could ever receive actual possession.

Professor Grant Gilmore, the primary drafter of UCC Article 9, provides guidance on the meaning of "receives possession" in Section 84-9-312(3). Professor Gilmore's treatise Security Interests in Personal Property has been described as "an invaluable source of legislative intent because he is the fountainhead in this area." B. Clark, The Law of Secured Transactions ¶ 1.01[2][c], at 1-8. In that treatise, Professor Gilmore states that "'[r]eceives possession' is evidently meant to refer to the moment when the goods are physically delivered at the debtor's place of business -- not to the possibility of the debtor's acquiring rights in the goods at an earlier point by identification or appropriation to the contract or by shipment under a term under which the debtor bears the risk." II G. Gilmore, Security Interests in Personal Property § 29.3, at 787 (1965). In light of Professor Gilmore's comments, we interpret UCC § 9-312(3)'s notification requirement to be triggered by actual possession of the inventory by the debtor. Because Sprague received Hoxie's notification within five years

before Morken could have received actual possession, that notification was timely.

Sprague complains that the purpose of Section 84-9-312(3) is frustrated by granting "superpriority" to a PMSI without requiring pre-perfection notification to prior filed secured creditors. It contends that debtors on the brink of insolvency will now have the motive to create "secret liens" to the detriment of prior-perfected secured creditors. The notification requirement, however, was not intended to allow other secured creditors veto power over the extension of new credit because the notification does not have to be given before the PMSI is acquired. The notification is required to

state "that the person giving the notice <u>has</u> or expects to acquire a purchase money security interest in inventory of the debtor, describing such inventory by item or type."  Kan. Stat. Ann. § 84-9-312(3)(d) (emphasis added).  Thus, the PMSI creditor can wait to notify competing secured creditors after it has acquired and perfected its security interest.  The Official UCC Comment explains that the notification protects the inventory financier from making additional advances to the debtor in the mistaken belief that it is secured by inventory which, in fact, has been financed by a third party with a PMSI in that inventory.  If the inventory financier "has received notification, he will presumably not make an advance; if he has not received notification (or if the other interest does not qualify as a purchase money interest), any advance he may make will have priority."  Kan. Stat. Ann. § 84-9-312 Official UCC cmt. 3.

    Our holding is consistent with this purpose in the context of this case.  Sprague did not extend further credit in reliance on the cattle serving as its collateral; in fact, Sprague had not made any loans to Morken since at least a year before Morken acquired an interest in these particular cattle.  We stop short, however, of holding, as did the district court, that a PMSI creditor that perfects by possession of inventory does not ever have to send a statutory notification.  It is not necessary to reach that issue  because Hoxie timely sent its statutory notification.  A different fact pattern in another case might justify a different conclusion.  <u>See</u> <u>Scallop Petroleum Co. v. Banque Trad-Credit Lyonnais</u>, 690 F. Supp. 184, 192 (S.D.N.Y. 1988)

(PMSI creditor was required to send notification even though debtor never had possession of the inventory).

## IV.

The "superpriority" of the purchase money security interest extends to inventory and "identifiable cash proceeds received on or before the delivery of the inventory to a buyer." Kan. Stat. Ann. § 84-9-312(3). Sprague argues that Hoxie does not have "superpriority" as to the proceeds from the cattle sales to IBP because Hoxie received

payment "two or three days" after delivering the cattle to IBP. We hold that Hoxie has priority over Sprague as to the proceeds from the cattle sales.

The "on or before delivery" language in this UCC provision was discussed by the Fourth Circuit in Sony Corp. of America v. Bank One, West Virginia, Huntington NA, 85 F.3d 131 (4th Cir. 1996). The court explained that this language "was meant to distinguish between cash proceeds and accounts proceeds." Id. at 136 (citing UCC § 9-312 Official UCC cmt. 3). The court concluded that "[t]he drafters of the U.C.C. decided to protect accounts financers over inventory financers, and they limited the priority of purchase money secured creditors to the cash proceeds of inventory collateral." Id. at 137 (citing UCC § 9-312 Official UCC cmt. 8); see also B. Clark, The Law of Secured Transactions ¶ 3.09[3][c], at 3-121 (describing the drafters' favorable treatment of the account lender over the PMSI creditor). Thus, the issue here turns on whether cattle sales generated an account receivable or cash proceeds.

The answer is found in the Packers and Stockyards Act, 1921, 7 U.S.C. §§ 181-229. The Act provides that for purposes of livestock sales to packers, "a cash sale means a sale in which the seller does not expressly extend credit to the buyer." 7 U.S.C. § 196(c) (1976). Even if there is a delay in payment, the transaction is a "cash sale" unless there is an express agreement extending credit from the seller to the buyer. See The First State Bank v. Gotham Provision Co., Inc. (In re Gotham Provision Co., Inc.), 669 F.2d 1000, 1004-05 (5th Cir. Unit B), cert. denied, 459 U.S. 858 (1982). There

was no written credit agreement here; therefore, the cattle transactions between Hoxie and IBP were cash sales and not accounts receivable.

Even if these were cash sales, Sprague argues that PMSI "superpriority" does not extend to the sale proceeds because Hoxie did not receive them "on or before the delivery of the inventory to the buyer."  The Fourth Circuit faced a similar issue in <u>Sony Corp.</u>, in which payment was received one day after delivery.   85 F.3d at 136.  The court refused to construe UCC § 9-312(3) to limit the PMSI creditor's "superpriority"

in inventory proceeds to only those proceeds received on the same day as delivery because such a construction would lead to arbitrary results. Id. at 137. Instead, the court adopted a "reasonably contemporaneous" standard and held that the creditor had priority in the sale proceeds received one day after delivery. Id.

When cattle are sold on a "weigh and grade" basis, the purchase price is determined after the cattle are slaughtered and the meat is graded and weighed. This explains the delay between delivery and payment. See In re Gotham Provision Co., 669 F.2d at 1005 n.3 (discussing the difference between "grade and yield" and "live weight" purchases). We follow the reasoning of the Fourth Circuit in Sony Corp. and hold that, in the circumstances of the sales here, Hoxie's receipt of the cash proceeds was reasonably contemporaneous with delivery. Accordingly, Hoxie's "superpriority" extends to those proceeds.

In conclusion, we reverse the district court's holding that Sprague did not have a security interest in the cattle, but affirm its judgment that Hoxie's security interest has priority over Sprague's security interest.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.