765 P.2d 1165

Kevin D. O'BRIEN and Denny (Dennis) McCoy, d/b/a T.C. Cattle Co., Plaintiffs-Appellants,

v.

William O. CHANDLER, R.E. "Rex" Reeves, First National Bank of Clayton, a New Mexico national bank, New Mexico Cattle, Inc., Craig Reeves and Gene Atchley, Defendants-Appellees.

No. 17257.

Supreme Court of New Mexico.

Dec. 5, 1988.

Richard A. Koehler, Geneva, Neb., Robert S. Skinner, Raton, for plaintiffs-appellants.

Robert O. Beck, Judith D. Cooper, Beck & Cooper, Clayton, for defendants-appellees.

## OPINION

RANSOM, Justice.

This action arose out of an oral agreement between Dennis McCoy, an Oklahoma cattle dealer doing business as T.C. Cattle Co.,[1] and William Chandler, a cattle broker from Texas. McCoy agreed to ship cattle to New Mexico Cattle, Inc. (feedlot) in Union County, New Mexico, for delivery to Chandler. The cattle consisted of four lots of steers and two lots of heifers with a combined total value of $119,122.30. They were delivered to the feedlot in March 1986, after which time McCoy provided invoices to Chandler, which described the cattle and set out the sales price. Subsequently, McCoy demanded payment. Chandler refused.

Without McCoy's knowledge, Chandler obtained a loan from First National Bank in Clayton (bank) and pledged as collateral the subject cattle. A financing statement and a security agreement covering the cattle were filed of record. The bank claims that it had no knowledge of any interest McCoy may have had in the cattle when it made the loan to Chandler.

McCoy sued to recover the cattle, claiming he was to retain title until payment was made by Chandler. Initially, the interested parties agreed that the cattle should be fed by the feedlot and sold at an appropriate time with the proceeds paid into the court. McCoy subsequently filed a motion for partial summary judgment seeking release of the cattle from the feedlot. The bank filed a counter motion for partial summary judgment, arguing that it had perfected a security interest in the livestock superior to any claim of McCoy. The court entered judgment for the bank, relying upon the facts specifically pled in McCoy's complaint and certain provisions of the Uniform Commercial Code (U.C.C.), NMSA 1978, Sections 55-1-101 to 55-9-507. We affirm.

The court ruled that the bank's perfected security interest in the subject cattle was superior to any interest or right of McCoy. The court determined Chandler's liability included the principal amount of the loan totaling $84,461.95 plus $9,814.94 in accrued interest and a per diem interest payment thereafter of $31.24. Further, the court enforced the agister's lien of the feedlot for the care, feeding, and maintenance of the cattle and ruled that the feedlot had a right to have this lien satisfied in the amount of $65,819.02 plus accrued interest of $7,212.32 and a per diem interest payment thereafter of $19.83. The court assigned the agister's lien a second priority behind the bank's claim. Based upon the above determinations as to the priority of lien interests, McCoy's claims against the feedlot, its owner and president, and the bank president were dismissed. Default judgment was entered against Chandler, who was duly notified of the hearing but failed to appear. The district court also determined that Chandler had committed a fraud against McCoy and, after a damages hearing, awarded McCoy actual damages in the amount of $139,459.49 for the value of the cattle plus interest and $90,000 in punitive damages. This award received third priority behind the other two claims.

*Summary judgment.* Once the bank made a prima facie showing of no genuine issue of material fact and that as a matter of law it was entitled to summary judgment, *see Goodman v. Brock,* 83 N.M. 789, 498 P.2d 676 (1972), the burden then shifted to McCoy to show at least reasonable doubt as to whether a genuine issue for trial existed. *Koenig v. Perez,* 104 N.M. 664, 726 P.2d 341 (1986). McCoy asserts that a genuine issue of material fact existed regarding the terms of the oral agreement as described in his deposition testimony.

**1.** By stipulation of all the parties, plaintiff Kevin D. O'Brien, co-owner of T.C. Cattle Co., was dismissed with prejudice as a party to the lawsuit on January 9, 1987.

In granting summary judgment, the district court based its decision on shipping bills showing the six lots of cattle to be delivered to the feedlot for Chandler and ruled that McCoy's verified complaint presented "positive and definite facts * * * that cattle were shipped by McCoy and * * * delivered to Chandler * * *." The deposition testimony of McCoy described a scenario whereby no obligation was created on the part of Chandler to purchase any of the cattle after delivery. Indeed, McCoy contends that according to their agreement Chandler had the right to reject any or all of the cattle. McCoy believed that once the cattle arrived at the feedlot, Chandler would inspect and sort the cattle and then negotiate a purchase price with McCoy. McCoy admits that Chandler did go to the feedlot and inspect the subject cattle, but claims that Chandler failed to engage in the selection and sorting process, thereby falling short of compliance with the terms of the agreement. Therefore, argues McCoy, no interest in the cattle was created in Chandler.

■ McCoy believes the district court disregarded (or perhaps weighed) his deposition testimony on this point. *See In re Adoption of Jane Doe*, 87 N.M. 253, 531 P.2d 1226 (Ct.App.), *cert. denied sub nom. Doe v. Roe*, 87 N.M. 239, 531 P.2d 1212 (1975) (a party who chooses to plead specific facts is bound by what has been specifically pleaded). In affirming, we do not disregard the deposition testimony. Giving due consideration to McCoy's deposition testimony, we agree with the trial court that it is incredible and unreasonable to infer that six separate lots of cattle were shipped by McCoy from Oklahoma to New Mexico without his having concluded a contract of sale as alleged in his verified complaint. The specific agreement between buyer and seller is simply not a material issue. What is material is the fact that delivery was made by a seller to a buyer, and that fact is not in dispute.

■ *Intention to conclude a contract: Identification of the cattle to the contract; Price left to be agreed.* McCoy argues that, because the cattle had not

been identified to the contract, title to these cattle had not passed to Chandler under NMSA 1978, Section 55–2–401(1). He asserts that Chandler's interest was consequently too slight to permit attachment of the bank's security interest. We disagree. Section 55–2–401(1) states:

[T]itle to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501 [55–2–501 NMSA 1978]), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act [chapter]. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the article on secured transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties * * *.

■ The clause on which McCoy relies refers to Section 55–2–501. This section provides: "The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them." § 55–2–501(1). The subject cattle in this case both were in existence and were the goods to which the oral agreement referred. The allegations that McCoy shipped the cattle to Chandler in New Mexico subject to Chandler's right to return some or all of the cattle and subject to further negotiations on the price do not raise material issues of fact as to whether a contract existed. The fact that the transaction was a "sale or return" does not negate the existence of the contract. *See* § 55–2–326. The buyer and seller may enter into a binding sales contract notwithstanding that they have yet to agree on a price. *See* § 55–2–305.

■ *Effect of delivery.* Because McCoy delivered the cattle under the contract, title passed to Chandler even though McCoy may have retained certain security inter-

ests in the cattle, as discussed below. Section 55–2–401(2) provides:

> [U]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading * * *

McCoy also claims that because the cattle were delivered to the feedlot and not to Chandler personally, it was necessary under Section 55–2–705 for the feedlot as bailee to notify Chandler that the goods were being held for him. Absent such notification, McCoy, as seller, could stop delivery of the goods. *See Ceres, Inc. v. ACLI Metal & Ore Co.*, 451 F.Supp. 921 (N.D.Ill.1978).

It should be noted that under *Ceres*, it is the seller who has the burden of showing that acknowledgement was not given to the buyer. *Id.* at 924. McCoy has failed to alert us to evidence that he attempted to stop delivery before Chandler was notified by the feedlot that the cattle were being held for him. McCoy admits that Chandler went out to view the cattle at the feedlot with the feedlot owner, Gene Atchley, before obtaining a loan from the bank and before McCoy alleged he attempted to reclaim the cattle. Thus, McCoy failed to exercise his rights under Section 55–2–705 in a timely fashion.

■ *The buyer's power to create a security interest in a third party under Article 2.* Because the goods were delivered to Chandler under the contract, he had the power to create a security interest in a third party. This interest attached even though Chandler was found to have committed a fraud against McCoy and thus only had voidable title to the cattle. Section 55–2–403(1) allows certain transferors to pass greater title than they themselves claim. *See In re Samuels & Co.*, 526 F.2d 1238, 1242 (5th Cir.) (party with perfected security interest in bankrupt buyer's after-

acquired inventory took priority over unpaid seller of cattle) *cert. denied sub nom. Stowers v. Mahon*, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). "Section [2–403(1) ] gives good faith purchasers of even fraudulent buyers-transferors greater rights than the defrauded seller can assert. This harsh rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers." *Id.* Section 2–403(1) provides:

> A purchaser of goods acquires all title which his transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though: * * * (d) the delivery was procured through fraud punishable as larcenous under the criminal law.

Given our discussion above, it is clear that the cattle had been delivered under a "transaction of purchase" and hence that Chandler was a "purchaser." *See* § 55–1–201(33) (Cum.Supp.1988). The court in *In re Samuels & Co.* held that under the comparable section of the Texas U.C.C. it is transfer of *possession* to the defaulting buyer which gives him the power to transfer good title to a good faith purchaser for value. 526 F.2d at 1246–47. Once McCoy delivered the cattle pursuant to his agreement with Chandler, under Section 2–403(1) Chandler had the power to transfer good title to a good faith purchaser for value.

The term "purchaser" is defined broadly under the U.C.C. to include an Article 9 secured party. *Id.* at 1242. Under Section 55–1–201(19), the only matter material to good faith is honesty in the conduct of the transaction at hand. Chandler had possession of the shipping invoices and represented that he had already paid for the cattle when he negotiated for the loan. McCoy has identified no fact that places into dispute the good faith status of the bank with respect to the bank's conduct in this trans-

action with Chandler. Therefore, the bank acquired a valid security interest in its dealing with Chandler, which the bank perfected by filing.

Comment 2 to Section 55–2–403 notes that the policy underlying the section as a whole is the protection of good faith purchasers such as Article 9 secured parties against "hidden interest[s]." Whether McCoy shipped the cattle to Chandler under a title-retention contract as alleged in his complaint, or whether he shipped the cattle to the feedlot pursuant to the agreement described in his deposition testimony, his retained interest in the cattle was indeed "hidden" from the view of the bank as a "good faith purchaser" within the meaning of Section 55–2–403.

It is with such considerations in mind that the court in *In re Samuels & Co.* stated that "[t]he Code's overall plan * * * typically favors good faith purchasers," 526 F.2d at 1241, and, "[a]ny seeming unfairness * * * resulting from the Code's operation is illusory, for the sellers could have protected their interest * * * if they had merely complied with the U.C.C.'s purchase-money provisions." *Id.* at 1247–48. Clearly, McCoy could have protected his interests in this case.

*The seller's security interests under Articles 2 and 9.* The next question is therefore whether McCoy, by virtue of his status as seller, had a superior interest to that of the bank or Chandler's other creditors in the subject collateral. McCoy claims that he possessed such an interest by virtue of NMSA 1978, Section 55–9–113. That section provides:

A security interest arising solely under the article on sales (Article 2) is subject to the provisions of this article except that to the extent that and *so long as the debtor* does not have or *does not lawfully obtain possession of the goods:*

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default by the debtor are governed by the article on sales (Article 2).

(Emphasis added.)

McCoy argues that because Chandler lacked documents of title to the cattle an issue of fact existed about whether Chandler's possession was unlawful and whether McCoy had a perfected security interest in the cattle, thus precluding summary judgment in favor of the bank. McCoy points out that under NMSA 1978, Sections 77–9–21 and 77–9–22, possession of livestock, including cattle, without the necessary documents of title is prima facie evidence that possession is unlawful. Thus, McCoy argues, because there is prima facie evidence that Chandler's possession was unlawful, McCoy met his burden of showing that he retained a security interest in the cattle, which was perfected before Chandler secured a loan from the bank using the same cattle as collateral.

■ McCoy's argument must fail. Even if McCoy established that he held a security interest under Section 55–9–113, the bank would still prevail in this case. A security interest under Section 55–9–113 is one that arises as a matter of law under Article 2. *In re Samuels & Co.*, 526 F.2d at 1247. Under Subsection (c) of Section 55–9–113, the rights of a seller are governed by Article 2 on sales. Comment 2 to Section 55–9–113 refers the reader to Sections 55–2–705, 2–706, and 2–707(2) in particular, which govern the seller's remedies regarding stoppage of delivery and resale after breach. In addition, the court in *Holiday Rambler Corp. v. Morris*, 32 U.C. C.Rep. 1222 (D.Kan.1981), *aff'd sub nom. Holiday Rambler Corp. v. First National Bank & Trust*, 723 F.2d 1449 (10th Cir. 1983), held that a seller's security interest allowed invocation of the right of reclamation under Section 55–2–702. *Id.* at 1226. However, the shipping invoices in this case indicate that the last of the cattle were delivered to the feedlot on March 29, 1986. McCoy alleged in his motion for partial summary judgment that he first made an attempt to have the cattle released to him on April 12, 1986. His attempt to invoke

his reclamation rights thus came after expiration of the ten day period provided by Section 55–2–702. *See Holiday Rambler Corp.*, 32 U.C.C.Rep. at 1226.

 In addition to an Article 2 security interest created as a matter of law under the U.C.C., a seller may create an Article 9 security interest by express agreement. *Id.* McCoy's oral title-retention contract with Chandler may have constituted an attempt to create such a security interest. However, such an interest, if created, falls outside the provisions of Section 55–9–113 and, like other Article 9 security interests, must be evidenced by a written agreement and filed before it could take priority over the perfected security interest of the bank. An oral agreement fails to meet this standard on both counts. The trial court therefore properly concluded that the bank, as a secured party, took priority over McCoy.

Based upon the foregoing, we therefore affirm the district court's entry of summary judgment.

IT IS SO ORDERED.

SCARBOROUGH, C.J., and WALTERS, J., concur.