## A08A1400. BANK OF DAWSON v. WORTH GIN COMPANY, INC.
### (671 SE2d 279)

PHIPPS, Judge.

The Bank of Dawson (Bank) extended farming loans to Jason Wiggins, who granted a security interest in his cotton crop to the Bank. Thereafter, the Bank filed a related financing statement to perfect its security interest. Wiggins later sold his cotton crop to Worth Gin Company, Inc. (Gin), which was engaged in the business of purchasing and then ginning farmers' cotton crops. The Gin deducted from the purchase price an amount for debts Wiggins owed in connection with his farming operation and then gave Wiggins a check for the remainder. The check was made payable to Wiggins and the Bank, jointly. The Bank sued the Gin for the amount it deducted, asserting that it had a security interest in Wiggins's cotton crop. On cross-motions for summary judgment regarding whether the security interest had been perfected and, alternatively, whether the Gin had actual knowledge of the security interest, the trial court ruled in favor of the Gin. For reasons that follow, we reverse and remand the case for proceedings not inconsistent with this opinion.

> A trial court properly grants a motion for summary judgment when there is no genuine issue of material fact and the movant demonstrates entitlement to judgment as a matter of law. We review, de novo, a grant of summary judgment, viewing the evidence, and all reasonable conclusions and inferences drawn therefrom, in a light most favorable to the nonmovant.[1]

The Bank extended farming loans to Wiggins in May 2003. The related security agreement Wiggins executed in favor of the Bank described the underlying collateral to include: "Farm Products and Supplies: All farm products including, but not limited to, . . . all crops, annual or perennial, growing or to be grown, and all products of the crops." The security agreement further described the collateral as "ASSIGNMENT OF CROPS AS PER ATTACHED EXHIBIT A, CROP PROCEEDS." Exhibit A was a one-page document with "JASON LANE WIGGINS" in the top margin, and after several blank lines, it provided a description of farm real estate.

Later in May, the Bank filed a financing statement in connection with the farming loans to Wiggins and their security agreement. The financing statement named Wiggins as the debtor; identified the Bank as the secured party; and pertinently indicated the collateral

---

[1] *All Fleet Refinishing v. West Ga. Nat. Bank*, 280 Ga. App. 676 (634 SE2d 802) (2006) (footnotes omitted).

covered by the financing statement as follows: "This FINANCING STATEMENT covers the following collateral: ASSIGNMENT OF CROPS AS PER ATTACHED EXHIBIT A, CROP PROCEEDS." The referenced and attached Exhibit A was the same document attached as "Exhibit A" to the security agreement.

In November and December 2003, the Gin purchased cotton from Wiggins. Before paying Wiggins, however, the Gin's president deducted and retained from the purchase price an amount to cover debts Wiggins owed the Gin and a separate farming-supply company. The Gin's president was part owner of both the Gin and the farming-supply company. The Gin's president handed Wiggins a check for the remainder of the purchase price, payable to Wiggins and the Bank jointly.

The Gin thereafter refused the Bank's demand for the amount it had retained from the proceeds of Wiggins's cotton crop, and the Bank instituted this action for conversion.[2] The Bank alleged that it had a perfected security interest in the cotton as a result of a loan it had extended to Wiggins, a security agreement between them, and a filed financing statement. In addition, the Bank claimed that the Gin had actual knowledge of its security interest. It alleged that in May 2003, it sent the Gin written notification of its security interest. The Bank sought compensatory damages, punitive damages, attorney fees and other litigation expenses.

The Gin moved for summary judgment, contending that the Bank had not held a perfected security interest in Wiggins's cotton crop when the Gin purchased it. Specifically, the Gin argued that the financing statement was insufficient because it failed to include information it claimed was required by OCGA § 11-9-502 (b) (4). That Code provision applies where a financing statement covers, among other things, "growing crops." It states, "If the debtor does not have an interest of record in the real property, provide the name of a record owner." In this case, Wiggins did not have an interest of record in the real property, and the financing statement did not provide the name of a record owner. According to the Gin, because of the cited omission from the financing statement, its filing was not effective to perfect the Bank's security interest.

The Bank also sought summary judgment. It countered that, notwithstanding the omission of the name of a record owner, the financing statement was not seriously misleading and that the filing

---

[2] See *All Business Corp. v. Choi*, 280 Ga. App. 618, 622 (2) (634 SE2d 400) (2006) (secured creditor has conversion action if property subject to its security interest is disposed of without creditor's authorization; where sale of collateral is, with respect to secured party, conversion of the collateral, conversion action may lie against the one who sold, as well as against the one who purchased, collateral).

thereof did perfect its security interest.[3] The Bank also argued that the Gin had actual knowledge of its security interest. The trial court granted the Gin's motion and denied the Bank's motion.

Pursuant to Georgia's Uniform Commercial Code (UCC),[4] except under circumstances not presented here, "a buyer, other than a secured party, of . . . goods . . . takes free of a security interest or agricultural lien if the buyer gives value and receives delivery of the collateral without knowledge of the security interest or agricultural lien *and* before it is perfected."[5] Pretermitting whether the Gin received delivery of Wiggins's cotton crop before any security interest was perfected,[6] we find the evidence undisputed that the Gin took the collateral with knowledge of the Bank's security interest.

Under Georgia's UCC, a "person," which "includes an individual or an organization,"[7] has "knowledge" of a fact "when he has actual knowledge of it."[8]

[K]nowledge . . . received by an organization is effective for a particular transaction from the time when it is brought to the attention of the individual conducting that transaction, and in any event from the time when it would have been brought to his attention if the organization had exercised due diligence.[9]

The Bank's executive vice president deposed that the Bank sent to the Gin written notification of its security interest in Wiggins's cotton crop via certified mail/return receipt requested in May 2003.

---

[3] See OCGA § 11-9-506 (a) ("A financing statement substantially satisfying the requirements of this part is effective, even if it has minor errors or omissions, unless the errors or omissions makes the financing statement seriously misleading.").

[4] OCGA § 11-1-101 et seq.

[5] OCGA § 11-9-317 (b) (emphasis supplied); see OCGA § 11-9-102 (45) (defining "goods" to include "crops grown, growing, or to be grown").

[6] Notably, the record contains evidence that the Gin purchased Wiggins's cotton not as a growing crop, but after it had been harvested and thus no longer attached to a particular parcel of land. The issue whether the financing statement *was* sufficient to the extent it covered harvested crops (as opposed to growing crops) as collateral was not considered below and has not been considered by this state's appellate courts; its resolution is not necessary for disposition of this appeal. But see, e.g., *United States v. Smith*, 832 F2d 774 (2d Cir. 1987) (contrasting perfection requirements for growing crops and harvested crops); *Bartolan, Inc. v. Columbian Peanut Co.*, 727 FSupp. 1444 (M.D. Ga. 1989) (same); *Frost State Bank v. Peavey Co.*, 524 NW2d 739 (Minn. Ct. App. 1994) (same). However, in *Innovative Clinical & Consulting Svcs. v. First Nat. Bank of Ames, Iowa*, 279 Ga. 672, 674, n. 2 (620 SE2d 352) (2005), the Court noted that an Eleventh Circuit's interpretation of a Code provision was not binding on it.

[7] OCGA § 11-1-201 (30).

[8] OCGA § 11-1-201 (25).

[9] OCGA § 11-1-201 (27).

A letter therein advised:

> Enclosed, please find a list of farmers who have indicated that they will be selling a portion of their 2003 crops to your company. Also enclosed are descriptions of the farms on which these crops will be planted, along with other supporting documentation. This will serve as your notice that the Bank of Dawson holds a 1st lien position on these crops, and all checks should be made payable jointly to the producer and the Bank of Dawson.

The Bank's executive vice president identified as a copy of one of the enclosed pages a document entitled "Notice of Security Interest in Farm Products." It named "Jason Lane Wiggins" as debtor, noted that "Farm Products" were subject to the security interest, and described the "Farm Products" as "Assignment of crops, crop proceeds . . . as per attached Exhibit A," which exhibit was a copy of the Exhibit A previously described in this opinion.

The Gin's president, who worked at the Gin most days, deposed that he was familiar with the Gin's receipt of written notifications from various banks concerning liens on cotton crops. Regarding the Bank's May 2003 mailing to the Gin, the Gin's president identified the signature upon the receipt for the certified mail as that of the Gin's day-to-day operations manager, who had authority to receive such mailings. The receipt was dated May 15, 2003, and the Gin's president admitted that he had seen the letter before he personally executed the Gin's purchase transaction of Wiggins's cotton the following November and December. The Gin's president claimed, however, that no documents had been enclosed with the letter as it had indicated, and he did not call the Bank to inquire about any referenced enclosures, explaining, "I didn't feel like that was my responsibility." Furthermore, the Gin's president explained, it was the Gin's normal course of business that if one of its customers owed it for harvesting costs, the Gin would withhold monies owed from the purchase price without contacting any associated lender. Thus, the Gin's president testified, before paying Wiggins for the cotton crop, "I just asked [Wiggins] if he owed the Bank of Dawson. I had a lien notice from them, but I didn't think it was an appropriate notice." According to the Gin's president, Wiggins replied, "Yeah, I do owe the Bank of Dawson," and further told him that the Bank had authorized a deduction from the proceeds for harvesting expenses owed to third parties. The Gin's president recounted, "So after I got what was owed me, I did the right thing" by making the check for the remainder payable jointly to Wiggins and the Bank.

The Gin's president's deposition testimony gave rise to an

inference that the documents referenced by the Bank's letter were inadvertently omitted and that the Gin therefore did not receive them as part of the Bank's certified mailing. But contrary to the Gin's position, such an inference created no issue of material fact in light of other evidence that the Gin had actual knowledge. The evidence was uncontroverted that Wiggins granted the Bank a security interest in the cotton crop; that Wiggins sold that cotton crop after it had been harvested to the Gin; that in selling that cotton crop to the Gin, Wiggins informed the Gin's president that the Bank held a security interest therein; and that in paying Wiggins for the cotton crop, the Gin's president gave a check to Wiggins payable jointly to him and the Bank. The only reasonable conclusion to be drawn from this undisputed evidence is that the Gin had actual knowledge that the Bank held a security interest in the cotton crop it was purchasing from Wiggins.

"A security interest or agricultural lien continues in collateral notwithstanding sale . . . or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien."[10] Although the Gin's president deposed that he had been told by Wiggins that the Bank had authorized a deduction from the proceeds for harvesting expenses, the Gin presented no evidence confirming the hearsay attributed to Wiggins. The only competent evidence as to whether the Bank had authorized such a deduction was provided by the Bank's executive vice president, and he adamantly denied in his deposition that the Bank had authorized the sale or disposition of the collateral free of its security interest.

This evidentiary record establishes as a matter of law that the Gin purchased Wiggins's cotton crop with knowledge of the Bank's security interest therein. Because the Gin withheld proceeds of the cotton crop, it was liable to the Bank on its conversion claim. Because the trial court erred in ruling otherwise,[11] we reverse the judgment and remand the case for consideration of the Bank's claims in light of this opinion.

*Judgment reversed and case remanded. Barnes, C. J., and Johnson, P. J., concur.*

DECIDED DECEMBER 1, 2008 —
RECONSIDERATION DENIED DECEMBER 15, 2008 —

*Collier & Gamble, Wilbur T. Gamble III*, for appellant.

---

[10] OCGA § 11-9-315 (a) (1).

[11] See generally *All Business Corp.*, supra at 622-625 (2) (a)-(b) (no action for conversion where buyer had neither constructive nor actual knowledge of security interest).

*Moore, Clarke, DuVall & Rodgers, James H. Moore III, Kim M. Minix*, for appellee.