## A11A0816. FARM CREDIT OF NORTHWEST FLORIDA, ACA v. EASOM PEANUT COMPANY et al.
### (718 SE2d 590)

MCFADDEN, Judge.

This dispute arises out of the bankruptcy of a peanut broker, Fidelity Foods. At issue are competing claims to proceeds from the sale of 2008 peanut crops. Easom Peanut Company, which warehoused and processed the peanuts, brought this action against multiple peanut growers and Farm Credit of Northwest Florida, ACA, which had loaned money to Fidelity, the now-bankrupt broker. The several parties raise a large number of issues in support of their claims that their interests in the proceeds are superior to the other parties' interests. We conclude that Farm Credit has a perfected security interest in the proceeds and that the growers have an unperfected security interest in the proceeds. Easom has a bailee's lien in the proceeds, and it may have an independent right to be paid. Whether a lack of good faith may alter the priorities of the parties' interests in the proceeds is a fact question.

The trial court granted summary judgment to Easom, ruling it was entitled to the entire amount it sought. Subject to Easom's claims, the court granted summary judgment to the growers. It denied Farm Credit's motions for summary judgment. Farm Credit appeals, contending that its security interest in the peanuts was superior to the growers'; that the trial court lacked the authority to re-order the priority of the security interests; that it was entitled to summary judgment on the growers' tort and breach of contract cross-claims; and that any lien Easom had over the peanut proceeds was inferior.

We find that Farm Credit had a security interest in the peanuts. In so finding, we hold, as to what appears to be an issue of first impression in Georgia, that the term "possession" as used in § 9-110 of the UCC includes constructive possession. But we find that whether Farm Credit's security interest is superior to the growers' and Easom's interests depends on an issue that the factfinder must resolve: whether Farm Credit acted in bad faith. We therefore reverse the grant of summary judgment to the growers on these issues but affirm the denial of summary judgment to Farm Credit. We affirm the trial court's denial of Farm Credit's motion for summary judgment on the growers' conversion claims because whether Farm Credit had the right to exercise dominion over the peanuts depends on the priority of the parties' interests, which, in

turn, depends on a resolution of the factual issue of bad faith. We reverse the trial court's denial of Farm Credit's motion for summary judgment on the growers' claims for punitive damages because, as a federal instrumentality, Farm Credit is immune from punitive damages awards. We affirm the trial court's denial of Farm Credit's motion for summary judgment on the growers' claims for indemnity and contribution because whether Farm Credit and the growers are joint obligors is not clear at this point. We affirm the trial court's denial of Farm Credit's motion for summary judgment on the growers' claims of fraud and misrepresentation, because whether Farm Credit misrepresented Fidelity's financial condition to the growers, thereby fraudulently inducing them to sell their peanuts to Fidelity, is a question for the factfinder. We reverse the trial court's denial of Farm Credit's motion for summary judgment on J. E. Golden Farms, Inc.'s breach of contract and promissory estoppel claims because enforcement of these claims is barred by the statute of frauds. We find that although Easom has a bailee's lien in the peanut proceeds, whether the lien has priority depends on whether the parties' priorities should be re-ordered because of bad faith, and thus reverse the trial court to the extent that it held otherwise. Finally, we find that the trial court erred in calculating the amount to which Easom may be entitled under a theory of quantum meruit; we reverse and remand on this issue so that the amount to which Easom is entitled under the doctrine of quantum meruit, if any, can be determined.

> A trial court properly grants a motion for summary judgment when there is no genuine issue of material fact and the movant demonstrates entitlement to judgment as a matter of law. We review, de novo, a grant of summary judgment, viewing the evidence, and all reasonable conclusions and inferences drawn therefrom, in a light most favorable to the nonmovant.

(Punctuation omitted.) *Bank of Dawson v. Worth Gin Co.*, 295 Ga. App. 256 (671 SE2d 279) (2008).

1. Fidelity Foods is a peanut broker, now in bankruptcy. In January 2008, Farm Credit, a cooperative bank, extended a $5 million line of credit to Fidelity to fund its operations. In exchange, Fidelity granted Farm Credit a security interest in its inventory, accounts, and other assets, including collateral, defined as "[a]ll peanuts of every kind and description shelled and unshelled, and wherever located and including but not limited to all peanuts owned by Debtor and stored at and/or processed by companies listed on 'Exhibit A.' " Listed on Exhibit A were six companies, including

Easom. On January 10, 2008, Farm Credit filed UCC financing statements in the applicable jurisdictions. The financing statements described the property in which Farm Credit had a security interest in the same words as those used in the security agreement. In March 2008, Fidelity entered agreements with Easom for the shelling and storage of peanuts.

Later in 2008, Fidelity entered contracts with the growers for the purchase of their 2008 peanut stock. Most of the contracts provided that

> the Seller retains all beneficial interest thus having control and title in the Peanuts until such time as title to said Peanuts is transferred to [Fidelity] and the warehouse receipt(s) relating to such Peanuts are delivered to [Fidelity]. Until such time, any damage to the Peanuts remains the responsibility of the Seller.[1]

The contracts did not specify how title would transfer, nor how or where the peanuts would be delivered. No warehouse receipts were ever delivered.

Before entering the contracts, some of the growers spoke with Rick Bitner, Farm Credit's East Region Lending Manager, about Fidelity's financial stability and ability to pay for the peanuts.

Fidelity directed that the peanuts be delivered to Easom and sent trucks to the farms for that purpose. Some of the growers were only partially paid and others were never paid at all. Fidelity paid Easom $547,134.87 of the $1,109,802.09 invoiced for its services in processing and storing the peanuts. Fidelity filed for bankruptcy protection on April 14, 2009. The bankruptcy court allowed Easom to sell the peanuts, and the proceeds were put in escrow pending the resolution of this lawsuit. The parties have agreed that any rights they may have had in the peanuts have become equivalent rights in the proceeds.

Easom filed this lawsuit against Fidelity, Farm Credit, and 17 growers, seeking to recover the reasonable value of its services. The growers answered and filed cross-claims against Farm Credit. Farm Credit answered and filed motions for summary judgment against four growers. The growers moved for partial summary judgment against Farm Credit, and Easom moved for summary judgment.

The trial court granted summary judgment to Easom for the full

---

[1] The contracts between grower Kenneth Ford and Fidelity do not include this provision. But Ford alleged in his cross-claim that because of United States Department of Agriculture regulations, his relationship with Fidelity is governed by the same provisions as the provisions of the contracts signed by the other growers.

value of its claim and to the growers, awarding them their proportionate shares in the proceeds remaining after Easom is paid. It denied Farm Credit's summary judgment motion on the growers' cross-claims. Farm Credit filed this appeal.[2]

## 2. The Priorities of Farm Credit's and the Growers' Security Interests

Farm Credit argues that its perfected security interest in the peanuts was superior to the growers' unperfected security interests. The trial court found that Farm Credit did not have a valid security interest.

### (a) Choice of Law

Both the security agreement between Fidelity and Farm Credit and the contracts between Fidelity and most growers[3] provide that Florida law controls. It is unnecessary to decide whether the Florida or the Georgia version of the Uniform Commercial Code governs the priorities of the growers' and Farm Credit's interests, however, because both Georgia and Florida have adopted the uniform versions of the provisions of the Uniform Commercial Code that are at issue. Compare *Mull Drilling Co. v. SemCrude, L.P.*, 407 BR 82 (Bankr. D. Del. 2009) (engaging in choice of law analysis when Kansas, one of the three jurisdictions at issue, had enacted a nonuniform amendment to its version of the Uniform Commercial Code).

### (b) Priorities

Georgia and Florida law both require that the "debtor [have] rights in the collateral or the power to transfer rights in the collateral to a secured party" before a security interest will attach to the collateral. OCGA § 11-9-203 (b) (2); Fla. Stat. § 679.2031 (2) (b). "[I]t is self-evident that in the absence of special circumstances a security interest can attach only to the extent of the interest of the debtor. . . . One cannot encumber another man's property in the absence of consent, estoppel, or some other special rule." *First Nat. Bank & Trust Co. v. Smithloff*, 119 Ga. App. 284, 290 (5) (167 SE2d 190) (1969). Contrary to Farm Credit's argument, Fidelity had to have rights in the peanuts for Farm Credit's security interest to attach, notwithstanding the broad language in the security agreement and UCC financing statement purporting to grant Farm Credit a security interest in "[a]ll peanuts of every kind and description shelled and unshelled, and wherever located and including but not

---

[2] The growers' "request for permission to file supplemental brief" is granted. We have read and considered the supplemental brief.

[3] The contracts between Georgia resident Ford and Fidelity do not specify which law controls. But, as noted in footnote 1, Ford alleged in his cross-claim that because of United States Department of Agriculture regulations, his relationship with Fidelity is governed by the same provisions as the provisions of the contracts signed by the other growers.

limited to all peanuts owned by Debtor. . . ."

However, we agree with Farm Credit that, in fact, the growers transferred title to the peanuts to Fidelity — and Farm Credit's security interest thus attached — when the growers delivered the peanuts to Easom. The trial court held that the growers did not transfer title to the peanuts to Fidelity because Fidelity never paid for or possessed the peanuts and because the contracts between Fidelity and most of the growers[4] expressly reserved to the growers all "beneficial interest" until title was transferred to Fidelity and warehouse receipts were delivered to Fidelity, events which, the trial court found, did not happen.

Under Georgia's enactment of the Uniform Commercial Code, Fidelity took title to the peanuts upon the growers' tender. *Diamond Crystal Brands v. Food Movers Intl.*, 593 F3d 1249, 1266 (11th Cir. 2010). OCGA § 11-2-401 (2) provides that "[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods. . . ." Florida law is the same. Fla. Stat. § 672.401 (2). The agreements between the growers and Fidelity do not define how title passes. Therefore, when the growers completed their performance under the contracts with Fidelity by delivering the peanuts to Easom, title passed to Fidelity.

And under OCGA § 11-2-401 (1), which mirrors Fla. Stat. § 672.401 (1), the growers' attempted reservation of title amounted to a security interest. That statute provides in part, "[a]ny retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest."

> The fact that the seller retains title to the collateral that has been sold to the debtor does not give the seller any right beyond an unperfected security interest in the goods, with the result that if there is no perfecting of the seller's interest in a manner specified by the Uniform Commercial Code, the interest of the seller is merely an unperfected security interest and therefore is subordinate to any perfected interest.

68A AmJur2d Secured Transactions § 814.

It is uncontested that the growers never perfected their security

---

[4] Although Ford's contracts did not attempt to reserve "beneficial interest," the trial court did not distinguish his contracts from its ruling. As noted above, Ford alleged in his cross-claim that because of Department of Agriculture regulations, the provisions of the contracts signed by the other growers governed his relationship with Fidelity.

interests. And Farm Credit's security interest was perfected, as it had filed financing statements and the security interest had attached. OCGA §§ 11-9-308 (a); 11-9-310 (a); Fla. Stat. §§ 679.3081 (1); 679.3101 (1). Therefore, Farm Credit's perfected security interest had priority over the growers' unperfected security interests, absent some exception. OCGA § 11-9-322 (a) (2); Fla. Stat. § 679.322 (1) (b); *Dixie Bonded Warehouse & Grain Co. v. Allstate Financial Corp.*, 693 FSupp. 1162, 1164 (M.D. Ga. 1988).

The trial court found applicable the exception based on the debtor's lack of possession. Farm Credit challenges that finding. We agree with Farm Credit.

Under OCGA § 11-9-110 and Fla. Stat. § 679.1101, the growers, as sellers, retained a reservation of a security interest in the peanuts. Further, "until the debtor obtain[ed] possession of the goods . . . [t]he security interest ha[d] priority over a conflicting security interest created by the debtor." OCGA § 11-9-110 (4); Fla. Stat. § 679.1101 (4). In other words, the trial court found that until Fidelity obtained possession of the peanuts, the growers' reserved security interest in the peanuts had priority over Farm Credit's security interest, which had been created by debtor Fidelity.

The trial court's reasoning depends upon the assumption that possession means "actual possession." We conclude that it does not. The code provision at issue does not define possession at all, much less as limited to actual possession. No Georgia case defines possession in the context of § 9-110 of the Uniform Commercial Code. In another context — involving the preservation of creditors' rights — Georgia courts have concluded that constructive possession is sufficient to allow a lien to attach. See *Hardeman & Sparks v. De Vaughn*, 49 Ga. 596, 599 (1873); *Kollock v. Jackson*, 5 Ga. 153, 154-156 (1848). We therefore construe the term "possession" in Uniform Commercial Code § 9-110 to include constructive possession. See *United Bank of Iowa v. Independent Inputs*, 538 F3d 858, 863-865 (8th Cir. 2008) (construing "possession" in another provision of Iowa's version of the Uniform Commercial Code, § 9-109, to include not only physical possession but also constructive possession). See also *Hong Kong & Shanghai Banking Corp. v. HFH USA Corp.*, 805 FSupp. 133 (W.D. N.Y. 1992) (holding delivery to warehouse amounted to possession); *O'Brien v. Chandler*, 765 P2d 1165, 1169 (N.M. 1988) (holding that debtor had possession of cattle when unpaid seller, who had not perfected any security interest in cattle, delivered cattle to feedlot pursuant to parties' agreement, and therefore bank's perfected security interest in cattle had priority).

Because the peanuts were delivered to Easom at Fidelity's direction where Fidelity had the right to control them, Fidelity exercised constructive possession. "[B]oth the power and the inten-

tion at a given time to exercise dominion or control over a thing" amounts to constructive possession. (Punctuation omitted.) *Lockwood v. State*, 257 Ga. 796, 797 (364 SE2d 574) (1988). Accordingly, the growers' unperfected security interests did not have priority under OCGA § 11-9-110 (4) or Fla. Stat. § 679.1101 (4).

The trial court further found that, even if the growers' security interests did not have priority, the court could reorder the priority of the security interests, given Farm Credit's bad faith. We agree with the trial court that "a lack of good faith on the part of a secured creditor may alter the priorities which would otherwise be determined by Article 9 provisions." *Central Soya Co. v. Bundrick*, 137 Ga. App. 63, 66 (1) (222 SE2d 852) (1975). See also *Central Bank of Alabama v. American Charms*, 149 Ga. App. 218 (253 SE2d 857) (1979) (affirming denial of secured party's motion for summary judgment since a material issue of fact existed as to whether it acted in good faith); *Graniteville Co. v. Bleckley Lumber Co.*, 687 FSupp. 589, 592 (M.D. Ga. 1988) ("[T]he absence of good faith in the conduct of a secured party is a consideration which, if sufficiently established by the evidence, may result in a reordering of the priorities among creditors.").

However, the trial court erred in granting summary judgment based on its finding of sufficient evidence that Farm Credit did not act in good faith, thereby permitting such reordering. The evidence as to that finding is disputed. "A trial court properly grants a motion for summary judgment when there is no genuine issue of material fact." *Bank of Dawson*, supra.

Under the Uniform Commercial Code, "'good faith' means honesty in fact and the observance of reasonable commercial standards of fair dealing." OCGA § 11-9-102 (a) (44); Fla. Stat. § 679.1021 (1) (qq). The growers presented at least some evidence that, in spite of Farm Credit's concerns, Rick Bitner, Farm Credit's East Region Lending Manager, assured the growers of Fidelity's financial stability and assured them that they would be paid. Farm Credit, on the other hand, presented evidence that nothing Bitner said to the farmers was untrue. Given the disputed evidence and the growers' failure to demonstrate that they were entitled to judgment as a matter of law, the trial court erred by granting summary judgment to the growers on the issue of Farm Credit's lack of good faith, and we reverse the trial court's ruling reordering the priorities of the security interests on this basis. We agree with the trial court that Farm Credit is not entitled to summary judgment on this issue because disputed questions of fact remain, and Farm Credit has not demonstrated that it is entitled to judgment as a matter of law. We thus affirm the trial court's denial of Farm Credit's motion for summary judgment. See *Central Soya*, supra at 66-67 ("The good

faith of a transaction is peculiarly a question for the trier of fact.").

3. **The Growers' Contract and Tort Claims**

Farm Credit contends that it was entitled to summary judgment on some of the growers' contract and tort claims. Again, we must determine which law controls. Georgia courts apply the lex loci delicti rule, which provides that "a tort action is governed by the substantive law of the state where the tort was committed." *Dowis v. Mud Slingers*, 279 Ga. 808, 809 (621 SE2d 413) (2005). As for contract actions, we apply the lex loci contractus rule, which provides that when a contract is made and to be performed in one state, its validity, nature, construction, and interpretation are governed by the substantive law of that state. *Godinger Silver Art Co. v. Olde Atlanta Mktg.*, 269 Ga. App. 386, 389 (2) (604 SE2d 212) (2004). When a contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is to be performed applies. Id.

(a) Farm Credit argues that the trial court erred in denying its summary judgment motion on the growers' conversion claims. It moved for summary judgment on this issue against J. E. Golden Farms, Inc., a Florida resident, and Jay Ag Air, Inc., a Florida resident. These growers alleged that Farm Credit wrongfully exercised dominion and control over the peanuts, which were located in Georgia. Therefore, if a conversion was committed, it was committed in Georgia. Since Georgia follows the lex loci delicti rule, *Dowis*, supra, Georgia law governs these claims. See also *Charash v. Oberlin College*, 14 F3d 291, 296 (6th Cir. 1994) (holding that a conversion takes place where the converter handled the property and under lex loci delicti, that place's law controls).

The trial court ruled that Farm Credit was not entitled to summary judgment on the conversion claims because whether Farm Credit wrongfully asserted dominion over the growers' property was a question of fact. Farm Credit contends that its assertion of dominion over the peanuts was not wrongful since it had a perfected security interest in the peanuts, superior to any interest the growers may have had.

Under Georgia law, "[c]onversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation." (Punctuation omitted.) *Trey Inman & Assocs. v. Bank of America*, 306 Ga. App. 451, 457 (4) (702 SE2d 711) (2010). "Any distinct act of dominion wrongfully asserted over another's property in denial of his right or inconsistent with it is a conversion." *Bromley v. Bromley*, 106 Ga. App. 606, 610 (1) (127 SE2d 836) (1962). Whether Farm Credit had the authority to

exercise the right of ownership over the peanuts depends on the issue of the priorities of the parties' interests. And, as we held in Division 2 (b), the issue of the priorities of the parties' interests depends on a resolution of the factual issue of bad faith. Therefore, the trial court did not err in denying Farm Credit summary judgment on the conversion claims.

(b) Farm Credit contends that the trial court erred in denying its motion for summary judgment on the growers' claim for indemnity and contribution because contribution comes into play only when entities are jointly liable in tort, which the growers do not allege, and there is no legal relationship between Farm Credit and the growers that would require Farm Credit to pay.

The growers counter that they can assert this claim because Easom alleges that the growers and Farm Credit are joint obligors for costs related to processing and storing the peanuts. OCGA § 23-2-71 provides:

> In cases of joint, joint and several, or several liabilities of two or more persons, where all are equally bound to bear the common burden and one has paid more than his share, he shall be entitled to contribution from the others. . . .

The right of contribution is not limited to tort liability. See *Goldhill v. Kramer*, 122 Ga. App. 39, 40 (3) (176 SE2d 232) (1970). As discussed in Division 4 below, the basis of Easom's right to payment is not clear. Consequently, it cannot be determined whether Farm Credit and the growers are joint obligors. See *Klausman v. Klausman*, 186 Ga. App. 669, 670 (368 SE2d 185) (1988) (holding contribution is appropriate when parties are jointly liable); *Helmet House Corp. v. Stoddard*, 861 S2d 1178, 1180 (Fla. App. 2003) (holding contribution is appropriate when the parties have a common obligation). Therefore, we affirm the trial court's denial of summary judgment to Farm Credit on the growers' claim for contribution.

(c) Farm Credit argues that the trial court erred in denying its motion for summary judgment on the fraud and negligent misrepresentation claims asserted by J. E. Golden Farms, Inc. and Jay Ag Air, Inc., both Florida residents, and the negligent misrepresentation claim asserted by Todd Wiggins, an Alabama resident.

J. E. Golden Farms alleged that Fidelity told it that as soon as its peanuts were delivered, Farm Credit would issue a check for payment. J. E. Golden Farms contacted Rick Bitner of Farm Credit in Tallahassee to verify Fidelity's statement. Bitner allegedly confirmed that Fidelity had a line of credit, that Fidelity's account was in good standing, and that upon receipt of the paperwork for the peanuts, Farm Credit would issue payment directly to J. E. Golden Farms.

J. E. Golden Farms thus entered the contract to sell its peanuts to Fidelity. J. E. Golden Farms contends that Bitner made the statements, knowing that payment would not be made, to induce it to deliver the peanuts, which improved Farm Credit's position as a secured creditor.

Because J. E. Golden Farms is a Florida resident that sustained injury in Florida, if anywhere, Florida law controls. *Intl. Business Machines Corp. v. Kemp*, 244 Ga. App. 638, 640-641 (1) (a) (536 SE2d 303) (2000). Farm Credit asserts that under Florida's economic loss rule, J. E. Golden Farms cannot pursue a negligent misrepresentation claim because it is also pursuing a breach of contract claim for the same conduct — Farm Credit's promise to pay for the peanuts. Under Florida law, "a fraud in the inducement claim is not barred by the economic loss rule so long as the claim is based on conduct that is separate and distinct from the conduct constituting the breach of contract." *Taylor v. Maness*, 941 S2d 559, 564 (Fla. App. 2006). J. E. Golden Farms asserts both that Farm Credit knowingly misrepresented Fidelity's financial condition to induce it to sell its peanuts to Fidelity and also, separately, that Farm Credit agreed to pay for the peanuts itself. Given these allegations of separate conduct, Farm Credit is not entitled to summary judgment on J. E. Golden Farms' fraud and misrepresentation claim, and we affirm the trial court in this regard.

Farm Credit asserts that it is undisputed that Farm Credit's agent never spoke to Wiggins or Jay Ag, and thus no misrepresentation was made to those growers. Jay Ag counters that Bitner spoke with grower D. Marcus Golden, who relayed the conversation to his son, Daniel Golden of Jay Ag. Todd Wiggins asserts that Bitner made the statements to his brother, grower Glen Wiggins, who relayed them to him. He adds that since he was in the class of persons whom Farm Credit should have expected to rely on the statements, that he can pursue his claim.

Because Jay Ag is located in Florida, it suffered loss, if any, in Florida, and Florida law controls its claims. *Intl. Business Machines*, supra. Because Todd Wiggins is a resident of Alabama, he suffered loss, if any, in Alabama, and Alabama law controls his claim. Id.

Under Florida law, "recovery may be had for misrepresentation as to a third party's financial condition where a person . . . induc[es] another to lend money or sell goods or other chattels on credit to said third person . . . by misrepresenting the solvency or financial responsibility of such third person." *Forbes v. Auerbach*, 56 S2d 895, 900 (Fla. 1952). The same is true under Alabama law. *Ringer v. First Nat. Bank*, 281 S2d 261 (Ala. 1973). And a person may be entitled to rely on a statement, even if it is not made directly to him. *Henson v. Celtic Life Ins. Co.*, 621 S2d 1268 (Ala. 1993); *Harrell v. Branson*, 344 S2d

604 (Fla. App. 1977). The trial court did not err in denying Farm Credit's motion for summary judgment on Jay Ag's and Todd Wiggins's claims for fraud and misrepresentation on the ground that it made no statements to them.

(d) Farm Credit argues that it is entitled to summary judgment on J. E. Golden Farms' promissory estoppel and breach of contract claims because they are barred by the statute of frauds. The claims were based on Bitner's alleged representation that Farm Credit would pay for the peanuts, independent of the status of Fidelity's line of credit. The alleged conversation occurred when grower D. Marcus Golden called Bitner at his Florida office.

Because the alleged agreement was made in Florida, when Golden called Bitner, the law of Florida governs. See *Godinger*, supra. J. E. Golden Farms alleged, not that Farm Credit promised to pay if Fidelity failed to pay, but that it directly, unconditionally promised to pay for the peanuts.

Florida's statute of frauds provides in part:

> [A] contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought. . . .

Fla. Stat. § 672.201 (1). J. E. Golden Farms does not dispute that the price for its peanuts exceeded $500. Therefore, to be enforceable, the contract had to be in writing. *Conner, I, Inc. v. Walt Disney Co.*, 827 S2d 318, 319 (Fla. App. 2002). And a party may not circumvent the requirements of the statute of frauds by alleging promissory estoppel. See *Shore Holdings v. Seagate Beach Quarters*, 842 S2d 1010, 1012-1013 (Fla. App. 2003). The trial court thus erred in denying Farm Credit's motion for summary judgment on J. E. Golden Farms' breach of contract and promissory estoppel claims.

(e) Farm Credit argues that because it is entitled to summary judgment on all of the growers' tort claims, it is entitled to summary judgment on the growers' punitive damages claims. Alternatively, it argues that lending institutions of the Farm Credit System such as itself are immune from punitive damages. We agree that, irrespective of the viability of the growers' tort claims, Farm Credit, as a federal instrumentality, is immune to a punitive damages award. See *Smith v. Russellville Production Credit Assn.*, 777 F2d 1544, 1549-1550 (11th Cir. 1985). The trial court found that because Farm Credit is a production credit association that has been granted the right to "sue and be sued" under 12 USC § 2093 (4), it is not immune to punitive damages. But in *Smith*, supra, the Eleventh Circuit expressly

rejected this argument.

The growers contend that under various United States Supreme Court precedents more recent than *Smith*, the sue-and-be-sued waiver must be given expansive construction. See, e.g., *United States Postal Svc. v. Flamingo Indus. (USA)*, 540 U. S. 736, 741 (124 SC 1321, 158 LE2d 19) (2004). They cite a California state court decision, *McGee v. Tucoemas Fed. Credit Union*, 63 Cal. Rptr. 3d 808 (Cal. App. 2007), supporting their contention that the sue-and-be-sued waiver includes a waiver of immunity from punitive damages. But other courts have expressly rejected their argument in decisions more recent than *Smith*. See, e.g., *Mays v. Tennessee Valley Auth.*, 699 FSupp.2d 991, 1029-1031 (E.D. Tenn. 2010). We find the Eleventh Circuit's analysis persuasive and follow it in holding that Farm Credit, as a federal instrumentality, is immune to a punitive damages award. Farm Credit thus is entitled to summary judgment on the punitive damages claims.

### 4. **Easom's Claims**

The trial court granted summary judgment to Easom, which warehoused and processed the peanuts, and directed the custodian of the peanut proceeds to pay Easom the entire amount it sought. The court did not specify the basis for its award, whether Easom had a bailee's lien, a warehouse lien, or was entitled to payment under a theory of quantum meruit.

A bailment is "a delivery of goods or property upon a contract, express or implied, to carry out the execution of a special object beneficial either to the bailor or bailee or both and to dispose of the property in conformity with the purpose of the trust." OCGA § 44-12-40. The delivery of peanuts to Easom created a bailment.

OCGA § 44-14-320 (a) (11) establishes a lien in a bailee, such as Easom. Similarly, OCGA § 44-14-409 provides that, "[t]he bailee for hire of labor and service shall have a special lien for his labor and services upon the thing bailed until he parts with possession. . . ." Under these statutes, to the extent the trial court ruled that Easom had a bailee's lien, it did not err. See also *Cowart & Dancer v. Bush*, 37 Ga. App. 278 (a) (139 SE 920) (1927) ("a bailee for hire . . . has a lien for his charges on the thing deposited").

OCGA § 44-14-400 provides that bailee's liens "shall be inferior to liens for taxes, liens of which such persons had actual notice before becoming creditors, special liens for rent, liens of laborers, liens or mortgages duly recorded, judgment liens, and other general liens reduced to execution and levied on." Farm Credit argues that under this statute, Easom's bailee's lien did not have priority, and the trial court erred to the extent it held otherwise. As Farm Credit argues, OCGA § 44-14-400 expressly provides that a bailee's lien is inferior to a duly recorded lien, and Farm Credit's duly recorded security

interest is such a duly recorded lien. See *Nationsbank of Tennessee v. Hardwick Carpets Intl.*, 233 Ga. App. 894, 896 (506 SE2d 174) (1998) (holding that perfected security interest is a lien for purposes of mechanic's lien statute). More to the point, OCGA § 11-9-333 (a) provides that, with exceptions not applicable here, a perfected security interest in collateral takes priority over the liens described in Title 44. Similarly, Fla. Stat. § 679.333 (2) provides that a possessory lien on goods has priority over a security interest unless the lien is created by a statute — such as OCGA § 44-14-400 — that expressly provides otherwise. Consequently, under these provisions, any lien rights Easom had under Title 44 are inferior to Farm Credit's rights, unless the priorities are re-ordered should the factfinder determine that Farm Credit acted in bad faith. See Division 2 (b), supra.

Easom asserts alternatively that it had a priority lien under the warehouse lien statute, OCGA § 11-7-209 (1). Farm Credit counters that Easom has no warehouse lien because it presented no evidence of warehouse receipts. The trial court adopted Easom's position that under the statute, even absent a warehouse receipt, it could claim a warehouse lien on the proceeds from the peanuts. But a plain reading of the 2008 version of the statute supports Farm Credit's position, not Easom's.

That version of the statute, OCGA § 11-7-209 (1) (2008), which was subsequently amended effective May 27, 2010, provided in part:

> A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

The Florida statute, Fla. Stat. § 677.209 (1) (2008), was virtually the same:

> A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his or her possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor, or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law.

These statutes provide that the warehouse has a lien "on the goods

covered by a warehouse receipt or on the proceeds thereof," meaning on the proceeds of "the goods covered by a warehouse receipt." "The issuance of a warehouse receipt by a warehouseman to the storer of the goods is a condition to the existence of a warehouseman's lien under OCGA § 11-7-209." *In re Charter Co.*, 56 BR 91, 95 (Bankr. M.D. Fla. 1985). To the extent the trial court ruled that Easom had a warehouse lien, it erred.

As another alternate ground, the trial court ruled that Easom was entitled to be paid from the proceeds based on a quantum meruit theory. Farm Credit contends that Easom does not have lien rights in the proceeds under quantum meruit because no evidence shows that any defendant prevented Easom from perfecting its lien. We agree.

> It is true that when a party entitled to a statutory lien has been prevented from perfecting such lien by the acts of the adverse party, such party is entitled to an equitable lien for the improvements made on a quantum meruit theory. The equitable lien is in place of the statutory one to which the petitioner would have been entitled if the adverse party had not prevented perfection of the lien.

(Citations and punctuation omitted.) *Lane Supply v. W. H. Ferguson & Sons*, 286 Ga. App. 512, 515 (649 SE2d 614) (2007). Easom does not allege that any party prevented it from perfecting its lien. Consequently, it does not have a lien in the peanut proceeds under a theory of quantum meruit.

But this does not negate the fact that Easom may be entitled to payment from Farm Credit under a quantum meruit theory. Under OCGA § 9-2-7, "when one renders service or transfers property which is valuable to another, which the latter accepts, a promise is implied to pay the reasonable value thereof." Farm Credit does not dispute the trial court's findings that it directed Easom to receive, process and shell the peanuts, or that Easom's efforts were valuable to it. Therefore, we affirm the trial court's judgment to the extent that it found that Easom may have a claim for payment by Farm Credit under a quantum meruit theory. We observe that Easom is barred from a double recovery. *Lee v. Shim*, 310 Ga. App. 725, 733 (3) (b) (713 SE2d 906) (2011). It therefore cannot recover for its charges under both a bailee's lien and a theory of quantum meruit.

Easom does not allege any facts tending to show that the growers impliedly promised to pay for peanut processing. Therefore, we reverse the trial court's judgment to the extent it ruled that Easom could collect from the growers under a quantum meruit theory. And its entitlement to payment under a theory of quantum meruit is not tied to the peanut proceeds. Rather, Easom must be

paid under such a theory by Farm Credit, which benefitted from Easom's efforts and impliedly promised to pay by directing Easom to process the peanuts. Consequently, we affirm the trial court's ruling that Easom may be entitled to be paid by Farm Credit under a quantum meruit theory, but reverse to the extent the trial court ruled that Easom is entitled to be paid under a theory of quantum meruit from the peanut proceeds.

We agree with Farm Credit that should Easom ultimately be found to be entitled to payment under a theory of quantum meruit, then the trial court must reconsider the amount of any quantum meruit award. The trial court awarded Easom the full amount it sought, including $263,543.60 in commissions. However, "[t]he reasonable value which the provider is entitled to recover in quantum meruit is not the value of the labor but the value of the benefit resulting from such labor to the recipient." *Hollifield v. Monte Vista Biblical Gardens*, 251 Ga. App. 124, 130 (2) (b) (553 SE2d 662) (2001). "Quantum meruit claims measure the value of services to the recipient, rather than the costs to the provider, and therefore [Easom's] alleged lost profits and costs are not recoverable." *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F3d 1274, 1282 (11th Cir. 2003). The trial court's judgment must be reversed to the extent it awarded Easom, under a theory of quantum meruit, its costs and profits rather than the value of its services to Farm Credit. Id.; *Hollifield*, supra.

*Judgment affirmed in part and reversed in part, and case remanded with direction. Andrews and Dillard, JJ., concur.*

DECIDED NOVEMBER 3, 2011 — ▮▮▮▮▮▮▮▮▮

*Alston & Bird, Nowell D. Berreth, Lisa R. Bugni, Todd R. David,* for appellant.

*Langdale & Vallotton, William P. Langdale, Jr., Christina L. Folsom, Floyd & Kendrick, David A. Kendrick, Flynn & Peeler, Patrick S. Flynn, Ernest A. Sellers, Jr.,* for appellees.