# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-1967
_____

Bayer CropScience, LLC; Bayer CropScience, Inc; Bayer AG; Bayer CropScience, NV; Bayer Aventis Cropscience USA Holding, Now known as Starlink Logistics, Inc.; Bayer Corporation; Bayer CropScience Holding, SA; Bayer CropScience, SA; Eagle Lake Rice Dryer; Genetically Modified Rice Common Benefit Qualified Settlement Fund; Golf Rice Milling; Looper Reed & McGraw; Stoneville Pedigreed Seed Company; Texana Rice; Texana Rice Mill; Bayer CropScience, Inc; Bayer CropScience Holding, Inc; Bayer CropScience, AG

*Plaintiffs*

v.

Stearns Bank National Association

*Defendant - Appellant*

Amegy Bank National Association

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: March 15, 2016
Filed: September 20, 2016

_____

Before WOLLMAN, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Bayer CropScience ("Bayer") brought this interpleader action to determine its obligations with regards to a settlement reached with Texana Rice Mill and Texana Rice, Inc. (collectively, "Texana"). That settlement came about as a result of lawsuits that arose when Bayer introduced genetically modified rice into the United States commercial long-grain rice supply. The parties in this appeal, Stearns Bank National Association ("Stearns Bank") and Amegy Bank National Association ("Amegy Bank") are both bank creditors of debtor Texana. Texana settled its commercial tort claim against Bayer, and after disbursement of certain amounts, $933,697.90 remains. Stearns Bank and Amegy Bank claim priority over those funds. The district court found for Amegy Bank, and we reverse that decision and remand this matter to the district court for further consideration.

I.

In November 2006, Texana sued Bayer in Texas state court for several claims related to the contamination of the United States rice supply by Bayer's genetically modified rice.[1] Among the damages claimed, Texana alleged the contaminated rice damaged its property "including any uncontaminated rice it purchased, and its plant, equipment, and improvements." The state court action was eventually removed to federal court and made part of an ongoing multi-district litigation. Texana and Bayer reached a settlement for $2,137,500, and Bayer made payment into the custody of the Clerk of Court for the United States District Court for the Eastern District of Missouri. After two uncontested disbursements, $933,697.90 remains.

Texana owes separate debts to Stearns Bank and Amegy Bank which total an amount in excess of the remaining settlement proceeds. Each bank argues that it has

---

[1]As the parties concede, Texas law applies to this action.

a superior priority interest in the proceeds. A timeline of events is helpful in understanding the parties' arguments.

September 13, 2002 – Stearns Bank made a $2.65 million loan to Texana. This loan was secured, in part, by a Commercial Security Agreement covering:

All Fixtures
All Chattel Paper, Equipment and General Intangibles (EXCLUDING INVENTORY AND ACCOUNTS RECEIVABLE)
[including] all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:
> (A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.
> (B) All products and produce of any of the property described in this Collateral section.
> (C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, or other disposition of any of the property described in this Collateral section.
> (D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.
> (E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

Stearns Bank perfected its security interest by filing a Uniform Commercial Code (UCC) Financing Statement with the Texas Secretary of State.

February 1, 2006 – Amegy Bank loaned Texana $2 million. Texana defaulted on the Amegy Bank loan in 2006.

November 8, 2006 – Texana brought its state court action against Bayer for the contamination of Texana's inventory and property by the genetically modified rice.

June 8, 2007 – Texana executed a written Forbearance Agreement with Amegy Bank. Pursuant to this agreement, Amegy Bank agreed to forbear on certain of its contractual and legal rights, and Texana in return gave Amegy Bank a security interest in its Bayer suit, a commercial tort claim. Specifically, Texana conveyed to Amegy Bank:

> All sums of money now due or to become due to [Texana] from any of the Defendants in the [Bayer] Lawsuits or any other third party in connection with the Claims and/or any other claim relating to the Contamination Issues . . . [a]ll sums of money paid by, or on behalf of, any of the Defendants in the [Bayer] Lawsuits or any other third party to [Texana] in connection with the Claims . . . [and] [a]ll other rights of [Texana] . . . under any settlement agreement entered into by [Texana] in connection with their assertion of any of the Claims and/or any other claim relating to the Contamination Issues . . . .

June 13, 2007 – Amegy Bank perfected its security interest in the commercial tort claim by filing a UCC Financing Statement of public record.

January 21, 2010 – Final Summary Judgment was entered against Texana for Texana's default on the Stearns Bank loan.

June 1, 2010 – Stearns Bank foreclosed on its Deed of Trust and security agreement. It later purchased all of the existing collateral sold at the foreclosure sale. As of January 20, 2014, $3,809,708.09 remained on the unpaid judgment against Texana.

September 8, 2012 – Bayer and Texana reached a settlement agreement.

October 5, 2012 – Stearns Bank applied for Writs of Garnishment in Texas state court and served the Writs on Bayer.

November 22, 2013 – Bayer filed this interpleader action in the United States District Court for the Eastern District of Missouri to allow any entities claiming an interest in the settlement proceeds to assert their claims.

In this interpleader action, Stearns Bank and Amegy Bank filed motions for summary judgment. Stearns Bank argued its security interest had priority because it filed a UCC financing statement covering Texana's general intangibles before Amegy Bank filed its UCC statement covering the Bayer suit. It also argued it was entitled to the Settlement payment as proceeds from its original collateral, which includes fixtures and equipment that was damaged by Bayer's negligence. Amegy Bank claimed in its summary judgment motion that Stearns Bank's interest in general intangibles could not cover the settlement in a subsequent commercial tort claim and that Stearns Bank's interest was discharged in the foreclosure. The district court granted Amegy Bank's motion and denied Stearns Bank's motion, entering judgment for Amegy Bank, but the district court has stayed enforcement of its orders pending this appeal.

II.

We review a district court's decision on cross-motions for summary judgment de novo. See J.E. Jones Constr. Co. v. Chubb & Sons, Inc., 486 F.3d 337, 340 (8th Cir. 2007). "Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." Id. "We also apply a de novo standard of review to the questions of law raised by the parties, including the

interpretation and application of the UCC." <u>Kunkel v. Sprague Nat'l Bank</u>, 128 F.3d 636, 641 (8th Cir. 1997) (citing <u>Affeldt v. Westbrooke Condo. Ass'n (In re Affeldt)</u>, 60 F.3d 1292, 1294 (8th Cir. 1995)).

A.

We begin our analysis where the district court concluded. The district court determined when Stearns Bank foreclosed on the collateral after Texana's default and then purchased the existing collateral at auction that Stearns Bank's security interest was discharged. We conclude this was error. The district court relied on an incorrect interpretation of Texas Business & Commerce Code Annotated (hereinafter "Texas UCC") § 9.617 to reach this decision. Texas UCC § 9.617(a) states "[a] secured party's disposition of collateral after default: (1) transfers to a transferee for value all of the debtor's rights in the collateral; (2) discharges the security interest under which the disposition is made; and (3) discharges any subordinate security interest or other subordinate lien." <u>Id.</u> The district court read this language broadly to preclude Stearns Bank from seeking proceeds of its original collateral. However, Stearns Bank, as a secured creditor, had the cumulative right to foreclose on its collateral as well as to enforce its security agreement as to the proceeds of its collateral. <u>See</u> Texas UCC § 9.601(c) ("The rights under Subsections (a) and (b) are cumulative and may be exercised simultaneously."). This holding is further supported by the language of the security agreement, which clearly states that collateral includes "sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer." A Tennessee bankruptcy court rejected a similar argument in <u>In re Ferry Road Properties, LLC</u>, 11-52170, 2012 WL 3888201 (Bankr. E.D. Tenn. Sept. 7, 2012). The bankruptcy court held that a foreclosure purchase of real estate did not preclude the creditor from asserting a lien interest in the debtor's property damage lawsuit. <u>Id.</u> at *5. Accordingly, Stearns Bank's foreclosure did not discharge an otherwise valid security interest in the proceeds of the collateral nor did it preclude Stearns Bank from pursuing its rights to such proceeds. We reverse the district court on this point.

Stearns Bank argues that once the Bayer commercial tort claim was settled and reduced to a contractual obligation to pay, it became a "payment intangible" under the UCC and Texas law. See Texas UCC § 9.109 cmt. 15 ("[O]nce a claim arising in tort has been settled and reduced to a contractual obligation to pay, the right to payment becomes a payment intangible and ceases to be a claim arising in tort."). A payment intangible is a subset of a general intangible, "under which the account debtor's principal obligation is a monetary obligation." See id. § 9.102(a)(62). Because Stearns Bank's original security agreement with Texana included general intangibles, it argues that it has a superior claim to Amegy Bank. The district court explained in the order on Stearns Bank's Motion for Reconsideration, that Stearns Bank's security interest in the settlement proceeds from the Bayer Suit did not attach until the suit settled in 2012. Thus, the court concluded that Amegy Bank, who had secured an interest in the Bayer commercial tort claim, had the superior claim to the settlement proceeds.

We conclude that Stearns Bank has no interest in the proceeds of the Bayer Suit as a general intangible due to the rule in Texas UCC § 9.108. Under Texas's revised UCC Article 9, creditors may take a security interest in commercial tort claims as original collateral. See id. § 9.109(d)(12). A commercial tort claim is defined, in relevant part, as "a claim arising in tort with respect to which . . . the claimant is an organization." See id. § 9.102(a)(13). Neither party disputes that the Bayer suit constituted a commercial tort claim. Whereas most debtor property can be secured by referencing its "type," such as "general intangibles" or "fixtures," see id. § 9.108(a) (stating "a description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described"), the UCC imposes heightened identification requirements to encumber commercial tort claims, see id. § 9.108(e) and cmt. 5 ("Subsection (e) requires that a description by defined 'type' of collateral alone of a commercial tort claim . . . is not sufficient."). The UCC imposes this heightened

description requirement "in order to prevent debtors from inadvertently encumbering" commercial tort claims. See id. § 9.108 cmt. 5. Further, the UCC states "that when an effective security agreement covering a commercial tort claim is entered into the claim already will exist" as of the time of the effective date of the security agreement. See id.; see also id. § 9.204 cmt. 4 ("In order for a security interest in a tort claim to attach, the claim must be in existence when the security agreement is authenticated.").

Accordingly, we hold that the drafters of the UCC, in implementing the heightened identification requirements of commercial tort claims including the requirement that the commercial tort claim to be in existence at the time it is encumbered, intended for the proceeds of a commercial tort claim to be excluded from an after-acquired general intangible clause. See 4 James J. White, Robert S. Summers, & Robert A. Hillman, Uniform Commercial Code § 31:5 (6th ed. 2015) (questioning "if we recognize a proceeds claim arising from a security agreement that was signed before the tort claim came into existence to be effective as to funds later paid to settle the tort, have we not voided the rule in 9-108(e)(1)?").

C.

This does not, however, end the analysis in this case. Stearns Bank also argues it should still have priority as to the portion of the Settlement Payment that is proceeds of its original collateral. See Texas UCC § 9.102 cmt. 5(g) ("A security interest in a tort claim also may exist under this Article if the claim is proceeds of other collateral."). As did the district court, we agree with this argument.

Proceeds include "to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, defects or infringement of rights in, or *damage to*, the collateral." See id. § 9.102(a)(65)(D) (emphasis added). Stearns Bank claims that its interest attached to the right of recovery for damage to its original collateral in October 2006.

Amegy Bank urges this court to follow the holding of In re Zych, wherein a bankruptcy court held that "the heightened identification requirement applicable to commercial tort claims survives disposition of the claim and extends to proceeds of a commercial tort claim." 379 B.R. 857, 861 (Bankr. D. Minn. 2007). The Zych court ultimately held that the creditor could not claim a security interest in the proceeds of the debtor's commercial tort claim because the security agreement did not identify the commercial tort claim by detailed type and because the commercial tort claim arose after the effective date of the security agreement. Id. at 864. To the extent that Zych applies generally to proceeds of a commercial tort claim, we agree. However, a superior interest in proceeds of original collateral is not displaced simply because damage to that collateral gives rise to a subsequent commercial tort claim.

When Bayer damaged Texana's equipment in 2006, Stearns Bank's interest attached to the right of recovery for damages to the equipment. This holding is in line with In re Wiersma wherein the court held that the settlement of a claim arising from damage to the dairy cows that served as collateral constituted "proceeds" within the meaning of UCC § 9-315(a)(2) ("[A] security interest attaches to any identifiable proceeds of collateral"). See In re Wiersma, 324 B.R. 92, 108 (B.A.P. 9th Cir. 2005), aff'd in part, rev'd in part, 483 F.3d 933 (9th Cir. 2007). A similar result was reached in BMW Financial Services, NA, LLC v. Rio Grande Valley Motors, Inc., No. M-11-292, 2012 WL 4623198 (S.D. Tex. Oct. 1, 2012). There, the district court held that "[u]nlike the definition of general intangibles, the definition of proceeds does not exclude commercial tort claims" and "a security interest does not cease to attach to collateral merely because the collateral is converted into proceeds." See id. at *10 (citing Paskow v. Calvert Fire Ins. Co., 579 F.2d 949, 954 (5th Cir. 1978)); see also Helms v. Certified Packaging Corp., 551 F.3d 675, 678 (7th Cir. 2008) ("If a suit against someone who steals or damages collateral eventuates in an award measured by the diminution in the value of the collateral caused by the defendant's wrongdoing, so that the award restores the original value of the collateral, the award, like an

insurance payment for damaged collateral, constitutes 'proceeds' of the collateral and is therefore covered by the lender's security interest.").

Further, this is the correct result under a plain reading of the UCC. The Texas law adopting the UCC explicitly states in comment 5(g) to Texas UCC § 9.102 that "[a] security interest in a tort claim also may exist under the Article if the claim is proceeds of other collateral." "Proceeds" is defined under the statute as "(A) whatever is acquired from the sale . . . or other disposition of collateral; (B) whatever is collected on, or distributed on account of, collateral; (C) rights arising out of collateral; (D) to the extent of the value of collateral, claims arising out of the loss, nonconformity, or interference with the use of, . . . or infringement of rights in, or damage to the collateral . . . ." Texas UCC § 9.102(a)(65). Moreover, "[a] security interest in proceeds is a perfected security interest if the interest in the original collateral was perfected." Texas UCC § 9.315(c). Accordingly, Stearns Bank held a security interest in the proceeds of the Bayer suit as a right of recovery with respect to damage to its original collateral.

Finally, the result is mandated by the language of Stearns Bank's security agreement with Texana. That agreement provided that the collateral consisted of "sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer." To the extent that the Settlement Payment from Bayer to Texana included payment for damages to Stearns Bank's original collateral, those sums are covered by the original security agreement.

III.

In conclusion, we hold that the district court erred in determining that Stearns Bank's foreclosure extinguished its rights to pursue the proceeds of its original collateral. While Stearns Bank does not have an interest in the Settlement Payment as an after-acquired general intangible because that payment arose as proceeds of a

commercial tort claim, it does have an interest in the Settlement Payment to the extent the payment is for damage to the original collateral. It remains to the district court to determine, on remand, what part of the sum held in the registry of the court constitutes proceeds of Stearns Bank's original collateral and what part does not constitute such proceeds. Accordingly, we reverse the judgment of the district court and remand this matter for further proceedings not inconsistent with this opinion.

_____